IN THE MATTER OF THE APPLICATION OF HAWAIIAN DREDGING COMPANY, LIMITED, FOR A WRIT OF MANDAMUS AGAINST C. S. HOLLOWAY AS SUPERINTENDENT OF PUBLIC WORKS OF THE TERRITORY OF HAWAII.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

ARGUED APRIL 5, 1905.                    DECIDED APRIL 12, 1905.

HARTWELL, J., AND CIRCUIT JUDGES DE BOLT AND LINDSAY IN PLACE OF FREAR, C.J., AND WILDER, J.

PAROL EVIDENCE RULE—*contemporaneous oral agreement postponing time of performance of written contract.*

> December 3, 1903, the respondent entered into two contracts with the petitioner, one for dredging section 1 and the other for dredging section 3 of Honolulu harbor, in accordance with plans and

specifications annexed and forming a part thereof, the contracts requiring the petitioner "to complete the same on or before the 31st day of March, 1904;" the specifications requiring that the "work must be completed within ninety days from starting the work," also that "payments will be made upon monthly estimates of the quantity of material removed to eighty per cent. of such value.". When the contracts were made it was estimated by the parties that after paying for section 1 about $3,000 would remain from the loan fund appropriation, and it was mutually understood that only the contract for section 1 should be performed until there should be funds available for the other section and the respondent should so notify the petitioner. After completing section 1 the petitioner May 6, 1904, informed the respondent that it had done so and was ready to start on section 3, "waiting for your instructions before commencing." At the suggestion of the petitioner the respondent wrote June 14, 1904, "It will be impossible to carry out the contract for dredging section 3 of the Honolulu harbor at the present time, as there are no funds available for this work." October 27, 1904, respondent wrote to the petitioner, "I should like to have the work of dredging a portion of slip No. 1 between the Hackfeld and Oahu Railway & Land Company's wharves taken up immediately," stating that the work would "make up a total yardage of approximately 9,700 cubic yards," and that "I do not feel that it will affect your contract with the government to dredge section 3." After completing slip 1 petitioner notified the respondent November 26, 1904, that it had done so and that it was "prepared to continue the work of dredging said section 3," to which letter respondent answered November 29, "I have been given to understand that you are continuing the work of dredging section 3 of the Honolulu harbor without any authorization from me, and wish to state that this action is entirely at your own risk." The petitioner nevertheless went on with the work and December 1 asked for a survey and estimate "under our contract for section No. 3 for the month of November," which the respondent declined. Held: (1) The respondent in engaging the petitioner to dredge slip 1 did not intend that this should be the beginning of the contract for section 3, but that the slip alone should be dredged at a cost of about $3,000, and that this should not affect the petitioner's contract to dredge the entire section "in case further appropriations are made by the legislature for carrying out this work." (2) The law permits a party to a written contract to show that an oral agreement was made at the time when

the contract was executed or subsequently, postponing the time of performance named in the contract, or that the contract was made on condition that the time of performing it should be postponed from the time named in the contract until the party for whom the service was to be performed should notify the other party to begin it or until there should be available funds to pay for the work agreed upon.

ID.,—*writ of mandamus.*

Held: The circumstances in this case do not permit a writ of mandamus to be issued compelling the respondent to measure and estimate the work done by the petitioner outside of slip 1 in section 3 as done under the contract as modified by the oral agreement.

Statement of the case: As set forth in the respondent's brief, the petitioner sought by mandamus to "compel the superintendent of public works of the Territory of Hawaii to make a survey and estimate of certain dredging work, claimed to have been performed by petitioner under the provisions of a contract entered into by the petitioner and respondent, and to compel respondent to draw and approve a voucher for the payment of such estimate. To the alternative writ, respondent demurred, and upon the overruling of such demurrer, made his return or answer to said writ and thereupon the suit came to trial. After petitioner had rested, respondent made a motion to dismiss the alternative writ, and upon the overruling of said motion, respondent, satisfied with the showing as then made by the petitioner, introduced no evidence and rested. After argument the petitioner asked permission to reopen its case, and the motion being granted, additional evidence ˜as introduced by petitioner, respondent sought to introduce evidence to sustain the issues on his part, but under the rulings of the court was unable to get in the evidence offered. Thereupon after argument the case was submitted and the court dismissed the petition and discharged the writ."

The following facts, as mentioned in the plaintiff's brief, appear in the record:

"In November, 1903, tenders for dredging sections 1 and 3 of

Honolulu harbor were called for and petitioner received both contracts as the lowest bidder. The first contract was performed and payments duly made and it is work done under the second contract which is now in question. Under that contract section 3 was to be dredged before March 31, 1904, and payments made at the rate of thirty-two cents a cubic yard, eighty per cent. of value of work done to be paid each month and the work to be finished ninety days after it was *begun.* After the completion of the first contract and before work was begun on the second, the superintendent of public works wrote (December 11, 1903) to petitioner that until further notice it would be necessary to limit the work to the sum of $3,000, which he claimed was all the money available."

Pursuant to this notice the petitioner did nothing upon the work of dredging section 3 until after receipt of the following letter from the superintendent of October 27, 1904, namely:

"Confirming my conversation of yesterday with Mr. Walter F. Dillingham, I should like to have the work of dredging a portion of slip No. 1 between the Hackfeld and Oahu Railway & Land Company's wharves taken up immediately. The material to be taken out is contained in the strip 80 feet in width from the wharf to the center of the slip to a depth of 32 feet below mean low tide, for a length along the wharf sufficient to make up a total yardage of approximately 9,700 cubic yards.

"I am having further soundings and cross sections made, and this should be completed to-day, so that I can advise you definitely as to the length of the strip to be dredged.

"In connection with this work, I do not feel that it will affect your contract with the government to dredge section 3 of the Honolulu harbor where the estimate of material was 183,400 cubic yards, in case further appropriations are made by the legislature for carrying out this work."

October 31 the petitioner answered as follows:

"We have to acknowledge receipt of your letter of the 27th inst., and in which you express a desire to have the dredging of slip No. 1 between Hackfeld and Oahu Railway & Land Co's wharves taken up immediately.

"As the work suggested by your letter is included within the limits of dredging to be done by this company under agreement of contract dated the 3rd day of December, 1903, and designated as section No. 3 in Honolulu harbor, we hereby notify

you of our willingness to comply with your direction to proceed with the removal of the material up to the yardage indicated, to wit, 9,700 cubic yards, and when the work is completed, and payments made, the same will be regarded as a partial performance of said contract, the total of estimated material of which was 183,400 cubic yards."

The petitioner did the work mentioned in the above letter, and November 26, 1904, informed the respondent that it had done so in the following letter addressed to him, namely:

"This company, having completed the dredging of that part of section 3 of Honolulu harbor designated in your letter of October 27 last, we take this opportunity of informing you that we are prepared to continue the work of dredging said section 3 in accordance with the terms and conditions of our contract with you dated the 3rd day of December, 1903, and that work will be resumed on the 28th day of November, 1904.

"We note in your letter of October 27 a reference to further appropriations which may be made by the legislature for carrying on this work. We do not understand that there is any lack of appropriation to cover payment for the removal of the remaining yardage embraced in the estimate under our contract. In this respect allow us to call your attention to the fact that when our contract was signed there were ample appropriations in force, to wit: An item of fifty thousand ($50,000) under act 10, and fifty thousand dollars ($50,000) under act 18, and that a further item of seventy-five thousand ($75,000) became available after January 1, 1904, by the passage of act 13, all of these laws having been enacted by the regular session of the legislature of 1903. We are not aware that these appropriations have been exhausted and they certainly have not expired, either by lapse of time or by the action of the special session of the legislature of 1904, for the reason that section 28 of act 39 of the Session Laws of 1898 makes provision for the continuance of appropriations where a contract has been made, by which a liability has been incurred, to issue or apply the same.

"The completion of the work covered by our contract for the dredging of section 3 above referred to, and the resulted payment of the amounts which would thereby become due, is of great importance to this company for the reason that large sums were expended in constructing suitable machinery and appli-

·ances wherewith to do the work, the non-performance of which will cause a heavy loss to us.  For this reason we propose to ·continue working under our contract, as intimated in the opening of this letter, being advised that a legal liability has been incurred by your department which will be enforced by the courts.  We trust, however, that no recourse to the courts may be necessary and that you may, after a review of the situation, conclude to arrange for the payment of the amounts which may become due as the work progresses."

On November 29 the respondent wrote to the petitioner as follows:

"I have been given to understand that you are continuing the work of dredging section III of the Honolulu harbor without any authorization from me; and wish to state that this action is entirely at your own risk.  I have already advised you of the amount of work to be done, and have your acknowledgment of the receipt of my letter."

On December 1 the petitioner writes:

"We would respectfully request a survey and estimate of the work performed by us under our dredging contract for section number 3 for the month of November."

To this last letter the respondent answered December 2, as follows:

"I am in receipt of your favor of the 1st inst., and in reply would say that not having authorized any work on the dredging of section III of Honolulu harbor, I do not understand the request for a survey and estimate of the work performed ·for the month of November."

As to the respondent's declaration in his letter to the petitioner above mentioned of December 11, 1903, that "referring to contract recently awarded for dredging section 3, Honolulu· harbor, I will say that until further notice it will be necessary for you to keep within the expenditure of $3,000 on this section," the petition avers that it "was in violation of said contract of the 3rd day of December, 1903, in which said respondent had agreed to make payments for the work done each month without restriction as to amount; that said restriction in expenditure rendered it impossible for the petitioner to

begin work on said section 3 without incurring heavy expense out of all proportion to the amount to be received for the work performed; that acting under the direction of said letter the petitioner at that time refrained from beginning the work of dredging said section 3." The transcript of testimony shows that prior to awarding the contracts the superintendent had told W. F. Dillingham, treasurer of the company, that owing to want of funds he hesitated about signing either one of the contracts, and that it was finally decided to make them, but that the contract for dredging section 1 was to be "put into effect first;" that by the time that was done funds might be available for carrying on the inner work comprised in the second contract, the respondent saying that then "we may see our way clear to go right ahead and put up more money to complete the inside." The effect of the letter of December 11, limiting the expenditure on section 3 to $3,000, was taken by the petitioner, as Dillingham testified, "as judgment that we were not to start at that time," and the entire action on the second conract was thereupon postponed until the petitioner "should get an order." After completing section 1 the petitioner, by letter of May 6, 1904, informed the respondent that it had done so and was ready to start on section 3 and "waiting for your instructions before commencing," when the respondent said that he was "anxious to go ahead with the development of the harbor as he had been, but that they had no funds in hand with which to do the work, and that the governor was opposed to going on with the contract, as he believed the Federal Government could be induced to do the work." Dillingham asked the respondent to write him a letter in regard to not continuing the work at that time as he "did not want in any wise to jeopardize our (contract) by not going ahead with the work. In other words I wanted to make it clear to him that we were ready to go ahead with the work and that it was through no fault of ours that we did not continue, waiting instructions from him to do so, and I got a letter from him to that effect" dated June 4, 1904, reading as follows:

"I beg to advise you that it will be impossible to carry out the contract for dredging section 3 of the Honolulu harbor at the present time, as there are no funds available for this work."

The following correspondence occurred upon the subject of the petitioner's request of December 1 for a survey and respondent's answer of December 2 above mentioned: December 8 petitioner wrote to the respondent requesting an immediate survey to be made "or we shall be compelled to institute legal proceedings against you to enforce our rights under our contract with you dated December 3, A. D. 1903, for dredging section 3 of Honolulu harbor." December 10 respondent answered that he was under the impression that the assistant superintendent had furnished an estimate of the work in the Hackfeld slip which was authorized by the respondent, and that the respondent understood that the petitioner "desired a further estimate of additional work which I understand you are doing in this part of the harbor without instructions from me. For your information I would say that the total yardage taken out of the Hackfeld slip according to our survey was 8,588 cubic yards, and I should be glad to approve voucher covering payment for this work when same is submitted." Thereupon December 13 petitioner wrote, "You are quite right in your impression that our letter of the 1st inst. was a request for a survey and estimate of the work done in the month of November last, in addition to the 8,588 cubic yards above referred to, and we now, for a third time, request that such a survey and estimate be furnished us immediately." December 16 the respondent answered as follows: "It was my impression, when you requested an estimate of work done in November that you had not been advised by Mr. Howland that he had already figured up the yardage taken out of the Hackfeld slip, and I inferred that you referred to this work. While you are correct in stating that I had already approved a voucher for payment on the work done in the Hackfeld slip, this voucher has never been placed on file in the auditor's office, so that a warrant could be drawn, as I understand you did not care to accept it as it was

worded. As to an estimate of any additional work done in sec-
tion 3, I have already advised you that this was not authorized,
with the exception of the dredging of the Hackfeld slip, and I
cannot therefore furnish you with any further estimate of work
which you may have done."

The voucher referred to was the petitioner's bill dated
November 23, 1904, on account of the "Appropriation dredg-
ing Honolulu harbor, contract of December 3, 1903,    *    *    *
To dredging section 3 of Honolulu harbor as per contract,
8,588 cu. yds., rate 32c, amount $2,748.16," upon which
voucher the assistant superintendent of public works had certi-
fied that "the above services have been faithfully performed;
that the above has been received in good condition." This
voucher was refused by the auditor because the contract of
December 3 allowed only eighty per cent. to be paid for the
work of each month and that the balance should be reserved
until the contract was completed. Accordingly the word "final"
was required by the auditor to be inserted in the bill before
approving it. The petitioner declined to accept this form, con-
sidering that it would mean the loss of the whole contract, and
thereupon this suit was brought.

### OPINION OF THE COURT BY HARTWELL, J.

The case does not permit us to doubt the respondent's inten-
tion in asking the petitioner to dredge slip 1 of section 3. He
did not intend that this work should be the beginning of the
petitioner's contract which by its terms would have to be com-
pleted in ninety days thereafter, but that the slip alone should
be dredged at a cost of about $3,000, and that this should not
affect the petitioner's contract to dredge the entire section "in
case further appropriations are made by the legislature for
carrying out this work."

It is true that the petitioner's October 31 letter expressing its
willingness to do the work states the obvious fact that it was
"within the limits of dredging to be done" under its contract,

adding "when the work is completed and the payments made the same will be regarded as a partial performance of said contract." If the petitioner meant by "partial performance" that dredging the estimated 9,700 cubic yards in slip 1 was a portion of the work of dredging the estimated 183,400 yards from the section, the remark would not mean that doing the work so requested was a beginning of the contract. The latter meaning, if intended, was directly opposed to the respondent's October 27 letter and to his evident and clearly expressed object from the beginning that the expense be kept down to $3,000, and that nothing more be done until further appropriations were made. The $3,000 worth of dredging in slip 1 could not lawfully have been contracted for by the respondent without advertising for competing bids, and was lawfully obtained by regarding the contract as in force and binding upon both parties as far as that work was done. We do not think that the petitioner was justified in the inference, whether made at the time of beginning the dredging of slip 1 or later, that the respondent meant that this work should be the beginning of the contract. The petitioner's right to begin and go on with the contract at any time after its date without awaiting notice from the respondent to begin it, or its duty resting upon an agreement, if any there was, to await such notice was not affected one way or another by the special engagement concerning slip 1. It is not claimed by the petitioner that work done in section 3, after completing slip 1, was expressly authorized by the respondent other than by making the contract.

And this brings us to consider whether the petitioner's contention is correct that the respondent had no right to delay the contract or to prescribe the time when the petitioner should begin to perform it, a contention based both on the claim that no agreement was made to that effect, and that if made the agreement, being oral, could not modify, enlarge or restrict the terms of the written agreement.

"The general rule is, that no verbal agreements between the parties to a written contract, made before or at the time of the

execution of such contract, are admissible to vary its terms or to affect its construction.   All such verbal agreements are considered as varied by and merged in the written contract.   But this rule does not apply to a subsequent oral agreement made on a new and valuable consideration, before the breach of the contract.   Such a subsequent oral agreement may enlarge the time of performance, or may vary any other terms of the contract, or may waive and discharge it altogether."   *Cummings v. Arnold,* 3 Metcalf 489, the court citing the rule laid down by Lord Denman in *Goss v. Lord Nugent,* 5 B. & Ad. 65 : "After the agreement has been reduced into writing, it is competent to the parties, at any time before breach of it, by a new contract not in writing, either altogether to waive, dissolve, or annul the former agreement, or in any manner to add to, or subtract from, or vary, or qualify the terms of it, and thus to make a new contract; which is to be proved, partly by the written agreement, and partly by the subsequent verbal terms engrafted upon what will be thus left of the written agreement."

In *Cooper v. Island Realty Co.,* 16 Haw. 92, it was held that in a suit for foreclosure of a mortgage the plaintiff could not show a contemporaneous parol contract that the mortgagor should pay taxes, but said, "This rule is subject to possible qualification, as in *Carr v. Dooley,* 119 Mass. 295, upon an offer to prove an independent agreement with reference to a distinct and separate matter, though founded upon a consideration embraced in the price of the land."   In the case last cited the plaintiff had been obliged to pay an assessment for a sewer which was a lien on an estate which the defendant had conveyed to him by deed dated June 8, 1870, the assessment not having been made until after the deed was delivered, although the sewer was constructed under the provisions of a previous statute and in pursuance of a prior resolution of the mayor and aldermen.   The action was brought on two counts; the first upon a covenant against encumbrances in the defendant's deed, and the second upon an alleged special promise to pay any assessment which should be made on account of the sewer then being built.   The consideration of the promise was averred to be the purchase of the land, and the promise was sought to be proved by a conversation between the parties during negotiations for the purchase and while the sewer

was in process of construction in front of the premises, the defendant having then said to the plaintiff, "I will pay all that. You shall not be called upon to pay a cent for it." As to this evidence the court held: "Upon the question of its competency, it is sufficient that it has a tendency to prove an independent agreement made with reference to a distinct and separate matter, and founded upon a consideration embraced in the price of the land. The language relied on was indeed part of a conversation which took place while negotiations were pending which ended in a deed with limited covenants of warranty and against incumbrances, but it is not open to the objection that it is here used to vary or enlarge in any respect the contents of a written instrument, or that the promise proved is within the statute of frauds."

"It is hardly pretended by counsel for plaintiffs that it was not competent, after the written contract was made and signed by the parties, for them to make another verbal contract in regard to some parts of it, which to that extent should be a substitute for the first one. There is nothing in the nature of the contract itself requiring it to be in writing, nor is there any principle making it necessary that the new one should be reduced to writing because the first was written." *Teal v. Bilby,* 123 U. S. 578.

"It is not necessarily fatal that the evidence is parol which is relied on to show that the contract was not made as it purports on the face of the document to have been made. There was a time when a man was bound if his seal was affixed to an instrument by a stranger, and against his will. But the notion that one who has gone through certain forms of this sort, even in his own person, is bound always and unconditionally, gave way long ago to more delicate conceptions." *Goode v. Riley,* 153 Mass. 587.

Professor Thayer, in his valuable Treatise on Evidence, in an interesting discussion of the parol evidence rule (p. 409), says: "The true inquiry is, whether certain claims or defences be allowable. If relief can be had in such cases, the law of evidence has nothing to say as to any kind of evidence, good under its general rules, which may be offered to prove these things.

In so far as extrinsic facts. are a legal basis of claim or defence, extrinsic evidence is good to prove them."

Clearly the law permits a party to a written contract to show that an oral agreement was made at the time when the contract was executed or subsequently, postponing the time of performance named in the contract, or to show that the contract was made on condition that the time of performing it should be postponed from the time named in the contract until the party for whom the service was to be performed should notify the other party to begin it, or until there should be available funds to pay for the work agreed upon.

We think that the facts shown by the evidence are that the respondent made both of the contracts with the petitioner with the mutual understanding that only the contract for dredging section 1 should be performed until there should be funds available for the payment of the work required by the other contract in dredging section 3, and should notify the petitioner to that effect; also that both parties acted in accordance with that understanding, until the dredging of slip 1 in section 3 came up for discussion, and that this was not intended by the respondent to affect the earlier understanding. In this view of the case the respondent was not required either to repudiate the contract or to notify the petitioner to begin it and cannot be compelled to recognize the petitioner's claim that it is entitled to perform the entire contract without notice from the respondent that funds are ready. It is true that if funds were not available for the contract the petitioner under this agreement would neither have the duty nor the right to perform it; and if the respondent was to determine whether funds, if available for the purpose, should or should not be used, the petitioner would practically be at his mercy, and the only value of the contract to the petitioner would be that if the dredging were done by the Territory at any time before March 31, 1904, or within any agreed extension of that period, the petitioner would have it to do, but taking the chance that in view of the possibility or fact of Congress appropriating money for the purpose the Territory

would not go to the expense. Either this was the mutual under-standing or else the parties agreed upon a postponement of the contract for section 3 until there should be funds available for the purpose, whether the respondent should determine to use them or not. This, however, would be giving the agreement too restricted a meaning to accomplish the clearly expressed object of the respondent, to control the expenditure. It is evident that at some time after the contract was made, perhaps about the time when the work of dredging slip 1 was agreed upon, the petitioner had in mind and was advised by its attorneys that it could hold the superintendent to performance of the contract whether there was money in the treasury to pay for the work or not. We do not find that the respondent at any time assented to this view, or until the petitioner's November 26 letter that he knew of his claim. It could not have been expected that delaying the work from December 3, the date of the contract, until December 31, which would leave ninety days until March 31, would show material change in Territorial finances, and there is no evidence that since then there was money in the treasury to meet the expenditure required for dredging section 3.

We infer that the trial judge dismissed the writ because he found that there was an oral agreement that the performance of the contract should await the respondent's direction. On this ground we sustain the decree appealed from.

*Kinney, McClanahan & Cooper* and *S. H. Derby* for petitioner.

*J. W. Cathcart* for respondent.