## KIMMERLE v. FARR.

### (Circuit Court of Appeals, Sixth Circuit. July 12, 1911.)

#### No. 2,106.

1. BANKRUPTCY (§ 303*)—SUIT TO AVOID PREFERENCE—BURDEN AND MEASURE OF PROOF.

Under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1909, p. 1314), the burden of proof is on a trustee in bankruptcy seeking to avoid as a preference a transfer of property made by a bankrupt to prove by sufficient evidence that the bankrupt (1) while insolvent (2) within four months of the bankruptcy (3) made the transfer in question; (4) that the creditor receiving the transfer will be thereby enabled to obtain a greater percentage of his debt than other creditors of the same class; and (5) that the creditor receiving the transfer had reasonable cause to believe that it was thereby intended to give a preference.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

---

**2. TRIAL (§ 105\*)—EFFECT OF ADMISSION OF EVIDENCE—FAILURE TO OBJECT.**
Evidence received, though incompetent as hearsay or otherwise, if not reasonably objected to on proper grounds, constitutes evidence in the cause.
[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 260–266; Dec. Dig. § 105.\*]

**3. BANKRUPTCY (§§ 166, 303\*)—VOIDABLE PREFERENCE—INTENTION OF DEBTOR —EVIDENCE.**
To render a preference voidable under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), there must have been an actual intention on the part of the debtor to give a preference; but, where the necessary result of the transaction was to create a preference, the law will conclusively impute such intention to the debtor.
[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. §§ 166, 303.\*]

**4. BANKRUPTCY (§ 166\*)—VOIDABLE PREFERENCE—INTENTION OF DEBTOR—EVIDENCE.**
A presumption of law that a bankrupt in making a paymᵃ t or transfer to a creditor intended to give a preference does not arise from the fact alone that he knew himself to be insolvent, nor is the creditor's belief that the debtor is insolvent in itself equivalent to a belief that he intends a preference so as to render the payment or transfer voidable under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445).
[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 166.\*]

**5. BANKRUPTCY (§ 303\*)—SUIT TO AVOID PREFERENCE—SUFFICIENCY OF EVIDENCE.**
Evidence considered in a suit by a trustee in bankruptcy to set aside as a preference a transfer of a mortgage by the bankrupt to defendant as security, and *held* insufficient to sustain the burden of proof resting on complainant to show that at the time of such transfer defendant had reasonable cause to believe that the bankrupt intended to give him a preference, or that such preference was in fact intended.
[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.\*]

Appeal from the District Court of the United States for the Western District of Michigan.

Suit in equity by Charles H. Kimmerle, trustee in bankruptcy of the City Bank of Dowagiac, against Willis M. Farr. Decree for defendant, and complainant appeals. Affirmed.

Clyde W. Ketcham and Chas. E. Sweet, for appellant.
Kleinhans & Knappen and C. W. Hendryx, for appellee.

Before SEVERENS and KNAPPEN, Circuit Judges, and SANFORD, District Judge.

SANFORD, District Judge. This is a bill in equity filed in April, 1909, in the United States District Court by the appellant, Charles H. Kimmerle, as trustee in bankruptcy of the City Bank of Dowagiac, against Willis M. Farr, the appellee, to set aside the assignment of a real estate mortgage from said bank to Farr, made within four months prior to the filing of the petition in bankruptcy, on the ground that said assignment constituted the giving of a preference voidable by the trustee under section 60 of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]).

The District Court being of opinion that the trustee had not sus-

tained the burden of proof in establishing either that the bank in assigning the mortgage to Farr intended to give him a preference, or that Farr had reasonable cause to believe that such intent existed, entered a decree dismissing the bill; from which decree the trustee has appealed to this court.

The City Bank of Dowagiac, a partnership composed of Frank W. Lyle, Ira B. Gage, and Leon R. Lyle, had been for many years engaged in carrying on the business of a private bank in the city of Dowagiac, Mich. The officers who had the principal charge and conduct of its affairs were Frank W. Lyle, president, and Ira B. Gage, for many years cashier and later vice president. On October 4, 1907, the defendant Farr, who was treasurer of a local committee appointed for the purpose of building a soldiers' monument, apparently fearing litigation over the funds with other persons claiming to be the lawful members of the committee, withdrew from deposit in the City Bank all funds that had previously been deposited in the bank to the credit of the treasurer of the committee, aggregating $2,549.86, and received in lieu thereof a draft in his favor for a like amount drawn by the City Bank, by Gage as vice president, on the National City Bank of New York, the City Bank agreeing at the time to pay Farr interest on this draft until collected, as on a certificate of deposit.

Farr retained this New York draft in his possession without presenting it for payment until February 7, 1908, when he took it to the City Bank, and surrendered it to the bank, and received from the bank in exchange a certificate of deposit for the amount of the draft and interest, $2,567.20. He also received from the bank as collateral security for the payment of this certificate of deposit the assignment of a mortgage for $3,000 held by the bank on certain real estate in Dowagiac. On the day following this assignment of the mortgage the bank closed its doors and suspended business. One week later the bank and its individual members filed their petition to be adjudicated voluntary bankrupts. Such adjudication was made, and the complainant was subsequently appointed trustee in bankruptcy in such proceedings.

The trustee is now seeking to set aside as a preferential transfer the assignment to Farr of the mortgage as collateral security to the certificate of deposit.

[1] Under sections 60a and 60b of the bankruptcy act, as it stood after the amendment of February 5, 1903 (Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 [U. S. Comp. St. 1909, p. 1314]), and prior to the amendment of June 25, 1910 (Act June 25, 1910, c. 412, 36 Stat. 838), the burden of proof is on a trustee in bankruptcy, seeking to avoid as a preference a transfer of property made by a bankrupt, to prove by sufficient evidence: That the bankrupt (1) while insolvent (2) within four months of the bankruptcy (3) made the transfer in question; (4) that the creditor receiving the transfer will be thereby enabled to obtain a greater percentage of his debt than other creditors of the same class; and (5) that the creditor receiving the transfer had reasonable cause to believe that it was thereby intended to give a prefer-

ence. Act July 1, 1898, c. 541 (30 Stat. 354); Act Feb. 5, 1903, c. 487 (32 Stat. 797); Tumlin v. Bryan (Fifth Circuit) 165 Fed. 166, 167, 91 C. C. A. 200, 21 L. R. A. (N. S.) 960; In re Neill-Pinckney-Maxwell Co. (D. C.) 170 Fed. 481, 483.

It is undisputed that the mortgage was assigned to Farr within four months of the bankruptcy, and that, if not avoided, its effect will be to give Farr a larger·percentage of his debt than other like creditors. And while the evidence as to the insolvency of the bank at the time the mortgage was assigned is meager, falling short of the requirements stated in Tumlin v. Bryan, supra, and would, in· large part, have been subject to exclusion if the action of the court below had been invoked thereon by proper objection, yet the fact that the bank was then insolvent is not now disputed, and in the present state of the record must be regarded as established by the weight of the proof. [2] Evidence, though incompetent as hearsay or otherwise, if not seasonably objected to on proper grounds or excepted to, constitutes evidence in the cause. Schlemmer v. Railway Co., 205 U. S. 1, 19, 27 Sup. Ct. 407, 51 L. Ed. 681; Damson v. Carrol, 163 Mass. 404, 408, 40 N. E. 185. And see Teal v. Bilby, 123 U. S. 572, 576, 579, 8 Sup. Ct. 239, 31 L. Ed. 263; Supreme Council of Catholic Knights v. Fidelity & Casualty Co. (Sixth Circuit) 63 Fed. 48, 57, 11 C. C. A. 96.

The controlling question in the case then is whether the complainant has established by the weight of the proof the fact that Farr had reasonable cause to believe that by the assignment of the mortgage it was intended to give him a preference.

We first proceed to a consideration of the principles of law in the light of which this question of fact is to be determined.

[3] 1. Upon the question whether the requirement of section 60b that the creditor "should have had reasonable cause to believe that it was intended thereby to give a preference" involves the necessity of showing that the debtor in fact intended to give a preference, there has been a diversity of opinion.

In Western Tie Co. v. Brown, 129 Fed. 728, 64 C. C. A. 256, in which it was held by the Circuit Court of Appeals for the Eighth Circuit that a transaction by which a creditor, without the consent of the debtor, appropriated to the payment of his claim property of the debtor which happened to be under his control, constituted a voidable preference, the court said that:

"an intention on the part of the insolvent to give a preference by means of a transfer which he makes is not always indispensable to its existence."

This decision was, however, reversed by the Supreme Court on the ground that to constitute a preference the transfer or payment must have been the act of the debtor. Western Tie Co. v. Brown, 196 U. S. 502, 509, 25 Sup. Ct. 339, 49 L. Ed. 571, cited on this point in Rector v. Bank, 200 U. S. 405, 419, 26 Sup. Ct. 289, 50 L. Ed. 527.

In Parker v. Black (D. C.) 143 Fed. 560, it was held that, if the creditor knew or had reason to believe that the debtor was insolvent at the time a payment was made on a pre-existing debt, such payment constituted a voidable preference "irrespective of whether the bank-

rupt intended to give a preference or not." To the same effect is Benedict v. Deshel, 177 N. Y. 1, 68 N. E. 999.

On the other hand, in Hardy v. Gray, 144 Fed. 922, 75 C. C. A. 562, it was held by the Circuit Court of Appeals for the First Circuit, after a full consideration of the language of the act and a review of former decisions, that to render a preference voidable under section 60b of the bankruptcy act, and therefore one which must be surrendered by the creditor receiving it before proving his claim under section 57g, there must have been an actual intention on the part of the debtor to give a preference or that which the law regards as its equivalent, since without the existence of such intention in fact on the part of the debtor the creditor cannot be said to have had reasonable cause to believe that a preference was intended. The court said:

"Naturally and justly it would be said that no one could be charged with a reasonable cause to believe something unless the something existed to which the belief was supposed to relate. It is true that the ordinary rule that a person who does an act is supposed to contemplate what results therefrom, applies to cases of this class, but only as an element; and it cannot apply even as an element unless the party who does the act has a knowledge of the essential facts which tend to produce the resulting consequences, or at least has a reasonable cause to believe them, or purposely shuts his eyes."

In In re First National Bank of Louisville, 155 Fed. 100, 103, 84 C. C. A. 16, 19, this court, speaking through Judge Severens, said:

"But, to make the reception of payment a preference, the creditor must have had reasonable cause to believe that the debtor was intending to give him a preference over other creditors, and we incline to think, with the Circuit Court of Appeals for the First Circuit (Hardy v. Gray, 144 Fed. 922, 925, 75 C. C. A. 562), that the reasonable implication of the language is that the debtor himself must have intended the preference. The very word signifies the doing of a thing with a purpose to give an advantage; and the construction which treats the motive of the debtor as indifferent seems artificial and awkward."

In Rutland County Nat. Bank v. Graves (D. C.) 156 Fed. 168, the court said:

"That, in order to make a payment a preference, it must have been made by the debtor with intent to prefer, and the creditor who received it must have had reasonable cause to believe that a preference was intended. To enable a trustee to recover, the equivalent of both these conditions must appear."

To the same effect are Collier on Bankruptcy (8th Ed.) § 60b, p. 671, and Tumlin v. Bryan, supra, in which the Circuit Court of Appeals for the Fifth Circuit cites, with apparent approval, both Hardy v. Gray and In re First Nat. Bank of Louisville, as holding that the reasonable implication of the statute "is that the debtor himself must have intended the preference."

After careful consideration we now hold, confirming, both upon principle and under the weight of authority, the intimation contained in Re First Nat. Bank of Louisville, that, under the necessary implication contained in section 60b of the bankruptcy act, in order to show that a creditor had reasonable ground to believe that a prefer-

ence was intended, it must appear that the debtor in fact intended to give a preference.

2. This rule is, however, subject to the manifest qualification suggested in Hardy v. Gray, supra, that the intention to give a preference may be shown not merely by proof of actual intent, but by its equivalent in law—that is, by proof that the necessary result of the transaction was to create a preference—in which case the intention to give a preference will be presumed. Where the inevitable result of a transaction between a debtor and creditor is to create a preference, the law will conclusively impute to the debtor the intention to bring about the result necessarily arising from the nature of the act which he does. Western Tie Co. v. Brown, 196 U. S. 502, 508, 25 Sup. Ct. 339, 49 L. Ed. 571.

[4] 3. However, a presumption of law that the debtor intended to give a preference does not arise from the fact alone that he knew himself to be insolvent. Hardy v. Gray, supra. It will often, if not generally, happen that a person, though in fact insolvent, will, while continuing his business in the usual way, make payments without a thought of disparagement of other creditors and with confidence in his ability to pay them all. In re First Nat. Bank of Louisville, supra, page 104, 155 Fed., 84 C. C. A. 16; Tumlin v. Bryan, supra, at page 168.

4. Neither is the creditor's belief that the debtor is insolvent in itself equivalent to a belief that he intends a preference. In re First Nat. Bank of Louisville, supra, at page 104; Tumlin v. Bryan, supra, at page 168; contra, Parker v. Black, supra. The creditor, as was said by this court in Re First Nat. Bank of Louisville, "may share in the confidence of his debtor, and may well suppose that the debtor while paying him his debt in the common course of business is acting without any purpose of giving special favor."

5. And as was said by the Circuit Court of Appeals for the Fifth Circuit in Tumlin v. Bryan, supra, at page 169:

"Reasonable cause to believe that a preference was intended cannot be held to be proved by circumstances that would merely excite suspicion. And circumstances may seem suspicious after the bankruptcy occurs that would not appear unusual at the time of their occurrence, and would then have presented no 'reasonable cause' on which to found a belief of intended preference. Merchants and other business men constantly continue to make payments up to the very eve of failure, and it would be disastrous to have them set aside on slight proof or mere suspicion. Grant v. National Bank, 97 U. S. 80, 24 L. Ed. 971; Stucky v. Masonic Savings Bank, 108 U. S. 74, 2 Sup. Ct. 219, 27 L. Ed. 640."

[5] We come then to consider whether, in the light of the foregoing rules of law, the complainant has shown, by the weight of the proof, that Farr had reasonable cause to believe that the bank intended by the assignment of the mortgage to give him a preference.

The material evidence bearing on this disputed question of fact, so far as necessary to be recited, is as follows:

Farr, who had been for about 20 years a depositor in the City Bank, and then had a small individual deposit in the bank, testifies, in substance, that needing, as treasurer of the monument committee, about

$2,500 with which to make a payment to the contractor, Rutherford, he went to the bank on February 6, 1908, and stated to Lyle and Gage, the president and vice president, that he wanted to get the currency which he had on deposit represented by his New York draft; that they hesitated and said that there was a financial stress on at that time among banks throughout the United States; that people were calling for their money, and they were a little short; that, if he did not actually want to use the money and would let it stay there, it would be an accommodation; that they thought the stress would be over in three or four weeks, and that the bank was perfectly solvent, and that, supposing any crisis should come, the bank had the assets and he would be paid; that after quite a discussion, in which he said he could probably pay the money due out of some private funds, if necessary, they finally asked him whether he would not let the money stay and accept collateral for it; that he took this matter under consideration overnight, and the next morning went back and said that he wanted the money, and had concluded not to take collateral; that they asked him if he had heard any rumors about the bank, and he answered that he had heard a little rumor about it, but paid no attention to it; that he was questioned also about another matter, and said that he had heard that a Mr. Atwood had drawn his money out, to which Gage replied that there was nothing in the rumor and that Atwood was doing business right along with them, and offered to show him the books, to which he replied that he would take their word for that, and did not care to see the books; that they finally offered him the real estate mortgage in question, on property which he knew; that, before accepting this mortgage, he went to see the attorney for the monument committee; that this attorney said it would not do any harm, and advised him to take the security, which he then did; and that he took the collateral, not for himself particularly, but because he felt under obligation to the subscribers to the monument fund and thought it was a business precaution. He further testifies that he believed their statement that the bank had the assets and that if a crisis should come he would be paid; that he had no thought or information that the bank was insolvent or anything of that kind; that he believed the bank was solid, although he didn't know but that it might be short on currency or something of that sort, as all banks were liable to be, and as he knew that all banks were hedging at the time, and using clearing house certificates; that he did not know that either Lyle or Gage individually owed the bank anything; and that he knew their individual properties in a general way and supposed from their real estate holdings that they were both perfectly solvent.

Rutherford, the contractor, corroborates Farr to the extent of stating that about the time of the failure of the City Bank he applied to Farr to pay him $2,500 to enable him to make a cash payment on granite he was purchasing for the monument, and that Farr replied that the banks were short of currency, and it might be a little slow, and he feared he would have to furnish the money from his own funds. But, on the other hand, Rutherford's testimony as to when the payments were made to him is vague and inaccurate, and it clearly

appears from other evidence that during all this time Farr had on deposit, as treasurer, more than $2,500 at another local bank which he did not draw out, and that in fact he made no payment to Rutherford until July 18th, when he paid him $2,550.

Lyle, the president of the bank, died before his evidence had been taken.

Gage, the vice president, testified, in substance, that Farr came into the bank on the afternoon of February 6th, and presented the draft, and said he guessed he would have to draw the money on it; that he asked him if he had to have it for the payment on the monument, and he rather hesitated, and finally said he did not, and he (Gage) remarked that if he did have to, if he would turn over the paper instead of using the currency, it would help the bank very much as he knew the condition of affairs at that time; that they were then in the midst or close of a panic; that Farr still insisted on drawing the money, and, after he had explained that he could not use the paper instead of drawing the currency, remarked that he had heard rumors, that it had been told him that the bank was in a precarious condition, and he wanted to protect himself by drawing the money; that he then asked Farr to go with him into the back room and talk to Mr. Lyle, which they did, and their previous conversation repeated in the presence of Lyle; that, after talking with Lyle for a time, Farr left the bank; and that the subsequent arrangement as to the assignment of the mortgage as security was made entirely between Farr and Lyle. He further testified that at that time the money market was very tight; that the banks in the cities were issuing clearing house certificates, and it was practically impossible for any country bank to get deposits which they had in financial centers to draw against, though drafts would go through the clearing house all right; that at that time if a customer came in he sometimes asked him if he could not use exchange or a certificate or something like that, but that if he insisted on the money he got it; and that the City Bank did not discount any paper, but borrowed and deposited as collateral, and thereby kept up its reserve. He further testified that, while he supposed the bank was securing Farr, the thought never entered his head that they were preferring him over other creditors, and he did not have any idea but that the bank was solvent and could pay everybody at the time, although he states that naturally he knew that they were putting Farr in a better position than the other creditors.

It further appears that in a former case in the criminal court in which Gage had been indicted he testified that he first learned or became satisfied that the bank would have to close at a conference between the members of the firm and their attorneys after supper on the night of Saturday, February 8th; that this decision was arrived at after some discussion and argument in regard to the insolvency of the bank; and that he then believed and insisted that the bank was solvent; although he admits that he confessed insolvency at the time the bank was closed, and that there was no substantial difference in the condition of the liabilities and assets of the bank as they existed on February 7th and on February 8th.

It further appears from the testimony of the trustee that the greatest borrowers in the bank at the time it failed were Lyle, the president, who owed it about $132,000 in notes and overdrafts which had been going on approximately three or four months, and Gage, the vice president, whose notes and overdrafts at the time the bank closed and for about three months prior thereto amounted to about $29,000; and that the total assets of the bank, as given by its books, including the notes of Lyle and Gage, amounted to $250,644.56; and the trustee expressed the opinion that the bank was insolvent for several years before it closed. There was, however, no evidence whatever as to the liabilities of the bank, and no other evidence as to the financial condition of either Lyle or Gage, either as to assets or total liabilities; the sole fact appearing being that within a few days after the bank suspended business they filed voluntary petitions in bankruptcy.

It further appears that on February 8, 1908, the day after this mortgage was assigned, the books of the City Bank showed that it had a credit with the National City Bank of New York of $103.41, after paying all drafts, and that, after the closing of the doors of the City Bank, the National City Bank of New York paid the trustee in bankruptcy the sum of $2,132.56 as a balance due the bankrupt estate.

The evidence also shows that on February 6th Farr's individual balance on deposit in the City Bank was $240.45; that on the 7th his account was credited with a deposit of $17.02, and debited with a check of $197.34, leaving a balance to his credit at the suspension of business of $60.13. There is conflicting evidence as to whether this $197.34 check was given for a feigned purpose in order to reduce his balance in the bank; but it is inconclusive in character, and need not be here set out.

There is also hearsay evidence to the effect that a few days after the bank's failure the local attorney for the monument committee, whom Farr consulted in reference to accepting the mortgage as collateral, and who appears inferentially to have drawn the mortgage, boasted in the presence of several persons that he had known that the bank was shaky and had taken care of his clients, who withdrew their funds or obtained security, although Farr's name was not mentioned in this connection. The testimony in this case was by stipulation taken by depositions before a notary public. At the time the depositions were taken the defendant objected to the questions calling for this evidence as hearsay statements not made in Farr's presence and incompetent, and also moved to exclude the testimony of one of the witnesses, but no ruling was made on the objection or motion by the notary public, and the witnesses were permitted to answer; and, so far as the record discloses, neither these objections nor the motion were called to the attention of the court at the hearing or any ruling of the court invoked thereon or any exception taken in any manner at the hearing to the admission of these answers. Upon the question whether the case of White v. Wansey (Sixth Circuit) 116 Fed. 345, 347, 53 C. C. A. 634, is to be regarded as controlling authority in support of the proposition that under the circumstances this evidence is now to be regarded as admitted without objection and by consent and

as now constituting a part of the evidence in the case, to be considered for what it is worth, the court is not agreed; but, without determining this question, it is sufficient to say that in the opinion of a majority of the court, even if considered, its character is such that it is not controlling of the case or of sufficient weight to change the conclusions otherwise reached by the entire court.

In addition to this it should be stated that Farr's attempted explanation of why he did not turn over the New York draft to Rutherford as a payment on account is evasive and unsatisfactory.

Upon the whole, after a careful consideration, the conclusion is reached that the complainant has failed to show by the weight of the proof regarded by the members of the court, respectively, as now constituting part of the evidence to be considered in the case, that Farr in receiving the assignment of the mortgage had reason to believe that a preference was thereby intended. While we concur in the view expressed by the learned district judge who tried the case below, that the reasons which Farr alleges for insisting upon the payment of the draft in currency were not the sole and probably not the controlling reasons for his action, and have no doubt but that he was alarmed about the condition of the bank, we think, with the trial judge, that neither the feeling of alarm and anxiety which exists among depositors in banks at a time of general financial depression and anxiety, such as is shown in this record to have existed at the time these transactions occurred, nor even the suspicion which the weight of the proof indicates that Farr may well have entertained, and did in fact entertain, as to the condition of the bank, is, in the light of the other evidence, sufficient to establish the fact that in receiving the assignment of the mortgage he had reason to believe that the bank intended thereby to give him a preference.

Under the meager evidence in this record as to the exact financial condition of the bank and of the individual members composing the firm, we do not think that it satisfactorily appears from the weight of the evidence that the officers of the bank then contemplated its suspension of business or insolvency, or that in assigning the mortgage to Farr they intended to give him a preference over other creditors. It is our opinion that upon the whole the weight of the proof, especially the testimony of Gage, indicates that they believed the financial depression would soon be over and that the bank would be able to continue in business and meet its obligations, and that they assigned the mortgage to Farr as collateral, not for the purpose of giving him a preference over other creditors, but rather for the purpose of satisfying his mind as to the condition of his claim so that he would not insist upon the immediate withdrawal of currency from the bank and precipitate a condition of affairs which in the then prevailing financial condition might result disastrously to the bank. The evidence discloses no motive whatever on the part of the officers of the bank for intending to prefer Farr over other creditors; on the contrary, they appear to have acted as they did in the expectation that by thus tiding over matters with him they would be able to keep up the bank as a going concern and eventually relieve its embarrassment.

While it is true that the financial condition of the officers who were its principal debtors, may have been such that it was clearly impossible for them to discharge their obligations to the bank and to make its insolvency inevitable, so that in assigning the mortgage to Farr an intent to give him a preference would have to be imputed to them as an inevitable result of the action taken, under the doctrine of Western Tie Co. v. Brown, 196 U. S. 502, 508, 25 Sup. Ct. 339, 49 L. Ed. 571, supra, it is sufficient to say that this condition of affairs is not shown in the evidence. What was the exact financial condition of the individual officers of the bank or of the bank itself and what was in fact the bank's financial prospect under the situation known to its officers is a matter of mere conjecture; and conjecture cannot supply the deficiency in the proof. The only positive evidence on this point is the testimony of Gage, who states unequivocally that the thought never entered his head that the bank was giving Farr a preference and that he had no idea but that the bank was solvent, and who appears to have believed up to the very hour of its suspension that the bank was in fact solvent and to have opposed its suspension to the very last. In the face of this evidence there is no sufficient inference to be drawn from the meager evidence in the record that either officer of the bank then realized that there would be any such loss on their personal loans from the bank as to make a collapse of the bank inevitable or imminent; and the entire conduct of its officers is consistent with the statement which, according to Farr's statement, they made him at the time that they believed the financial stress would be over in a few weeks, and that, even if a crisis should come, the bank had the assets.

We therefore hold that upon the entire evidence the trustee has not shown by the weight of the proof that the bank by the assignment of the mortgage to Farr intended to give him a preference, and has failed to show that Farr, in receiving the assignment of the mortgage, had reason to believe that a preference was thereby intended.

The decree of the District Court dismissing the bill of complaint will accordingly be affirmed, and the appeal dismissed, with costs.