## CHAMBERS v. CONTINENTAL TRUST CO.

### In re JELKS.

(District Court S. D. Georgia, W. D.   July 31, 1916.)

1. BANKRUPTCY ⚖☞228—FINDING OF REFEREE—PRESUMPTION.
   When there is an issue of fact, a presumption obtains in favor of the finding of the referee in bankruptcy on the facts.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 387; Dec. Dig. ⚖☞228.]

2. BANKRUPTCY ⚖☞175—FRAUDULENT CONVEYANCE—ACTUAL FRAUD.
   A transaction between the director of an insolvent bank and another bank which took over its liabilities, whereby the director transferred property to such other bank, must be impugned, as violative of Bankruptcy Act July 1, 1898, c. 541, 30 Stat. 544, if at all, by actual fraud, as distinguished from constructive fraud.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. ⚖☞175.]

3. BANKRUPTCY ⚖☞166(1)—CONVEYANCE BY INSOLVENT—VALIDITY—STATUTE.
   Where the director of an insolvent bank must have known his own insolvency when he conveyed property to the trust company which had undertaken to liquidate the affairs of his bank, not to benefit his own creditors, but to secure the trust company against loss in case the assets of the bank proved insufficient to pay its liabilities, the trust company being ignorant of the insolvency of the director and having no reason to believe that a preference was intended, there was no violation of Bankruptcy Act, § 67e (Comp. St. 1913, § 9651), providing that all conveyances, transfers, etc., made by the bankrupt within four months prior to the filing of the petition with the intent to hinder, delay, or defraud his creditors, shall be void as against such creditors, except as to purchasers in good faith for a present and fair consideration.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250, 251; Dec. Dig. ⚖☞166(1).]

Action by Hugh Chambers, trustee of E. N. Jelks, bankrupt, against the Continental Trust Company. On petition for review of a finding of the referee. Finding reversed, and decree ordered to be taken in accordance with the opinion.

A. W. Lane, of Macon, Ga., for bankrupt.
Walter De Fore, of Macon, Ga., for trustee.
Orville A. Park, of Macon, Ga., for Continental Trust Co.

SPEER, District Judge. In July, 1914, the Commercial National Bank of Macon had become seriously embarrassed. Its financial distress involved also its companion institution chartered by the state. This was the Commercial & Savings Bank. These two banking corporations had enjoyed to a large degree the confidence of the general public, and the officials of both, when the impending disaster was evident, at once undertook the most vigorous measures to save harmless their depositors and creditors. Application for assistance was promptly made to Mr. R. J. Taylor, the president of the American National Bank, and of the Continental Trust Company. The American National was, without doubt, the strongest banking institution in

Central Georgia. The Continental Trust Company, with the same president, possessed the same relative strength.

In their distress, the officers of the Commercial National applied to the American National to assume the liabilities, take over its assets, pay depositors and other creditors, and thus liquidate its liabilities. The war in Europe was imminent. The public mind in Macon and elsewhere in high excitation, and the complete failure of the Commercial National, serving, as it did, the business community so widely, would doubtless have occasioned the most alarming results. A similar failure on the part of the Commercial & Savings would have been little less calamitous. The latter applied to the Continental Trust Company to do for it what the Commercial had sought from the American National. With the utmost generosity and public spirit, these two strong institutions flew to the assistance of their weaker brothers. Nor did the other Macon National Banks betray a spirit less broad or less judicious.

On inquiry, the governing body of the American National was of the opinion that the assets of the Commercial National were adequate to justify it in assuming the burden of liquidation, and this the American at once undertook. An investigation of the condition of the Commercial & Savings showed conditions less favorable. The Continental Trust Company, it was determined after consideration, could not undertake the liquidation of the Savings Bank unless guaranty from loss in addition to its assets was offered. The other National Banks of Macon, the Citizens', the Fourth National, the Macon National, and the American, contributed a liberal share of the $173,000, and this they have paid.

In the successful effort to save the widespread loss and suffering which would have resulted to hundreds, possibly to thousands, of the depositors and creditors of these banks, if successful liquidation was defeated, the president and the directors of the Commercial and the Savings Bank at once pledged their personal means. They held back nothing. They even mortgaged their homes, and in some instances their wives and children surrendered their all; they did everything that men of probity could do to save from great loss those who had trusted them, of whom, many were in humble life, doubtless many, in danger of the direst penury. The result has been that every creditor and every depositor in the Commercial National and in the Commercial & Savings has been paid to the uttermost farthing. It is however, most regrettable that large loss has fallen upon the American National and the Continental Trust Company because of their liberal and effective efforts to save the depositors and creditors of the failing banks from conditions only in part here described. Among the directors of the Commercial National and the Savings Bank who pledged their all in aid of this most commendable effort was Mr. E. N. Jelks. Conveying much else, he executed a deed to the Continental Trust Company to his home at Rivoli, a suburb of Macon. The deed was to secure a demand note dated August 3, 1914, for $25,000. The proceeds of this note were at once placed to the credit of the Commercial & Savings

Bank. Mr. Jelks had, shortly before, raised $25,000 by pledging all the interest he had in a large and apparently profitable business in the state of Florida, the proceeds of which he used to reduce his indebtedness to the Commercial National. This conveyance by Mr. Jelks has been sustained by the referee, and, on petition for review, has been affirmed by this court.

The transfer to the Continental Trust Company of his Rivoli home property, as a part of the guaranty fund to secure the Continental Trust Company for payment of the depositors and creditors of the Commercial & Savings Bank, the referee, upon consideration, annulled as violative of section 67e of the Bankruptcy Act. That section in substance provides that all conveyances, transfers, etc., made by the bankrupt within four months prior to the filing of the petition, with the intent or purpose on his part to hinder, delay, or defraud his creditors, shall be null and void as against the creditors of such debtors, except as to purchasers in good faith and for a present and fair consideration. This finding of the referee was brought here by this petition for review. Therefore the question to be determined is, Was the Continental Trust Company a purchaser in good faith and for a present and fair consideration?

There is no issue raised as to the fairness of the consideration. The referee finds that the Rivoli property will probably bring $10,000 less than the note of guaranty it was given to secure. Nor is it denied that the consideration was present and immediate. The transaction was between Jelks and the Continental Trust Company, and to that company Jelks was in no sense indebted. The Continental Trust Company, then, could have had no selfish or sinister motive in lending the money. It does not appear from the evidence that the status of Jelks' creditors was discussed in any way by the negotiating parties, or the fact that he had creditors. The sole inquiry was this, Is his guaranty to the liquidative fund satisfactory? It does not appear there were any liens recorded against him. He was regarded as one of the most prosperous members of the community by every one. It is true that he conducted a large business, and men, thus engaged, usually carry some liability; but this did not suggest insolvency. Indeed, the trustee in bankruptcy, who assails this transfer, Mr. Hugh Chambers, then a practitioner of law, a lawyer of fine intelligence and high character, now the judge of one of our important courts, testified as to Mr. Jelks:

"I regarded him as one of the foremost men in the community, and worth over $75,000."

There was much other evidence to the same effect. Mr. L. P. Hilyer, vice president of the American National, and judicially known to be a director of the Federal Reserve Bank of this district, testified:

"The American National Bank has been taking Jelks' paper right along from the Bibb Brick Company, and we have regarded it as good paper. I have heard Mr. Taylor, president of the American National Bank, say several times, 'Oh Jelks is good! He is good! That man is worth $75,000 to $100,000.'"

Mr. Taylor's view of insolvency is not an "iridescent dream."

Mr. W. R. Rogers, secretary of the Continental Trust Company, testified that at the time Jelks' guaranty was made he had no reason to believe that Jelks was not entirely solvent; and his paper in the Commercial & Savings Bank was regarded as all right; that "we would get our money."

An apparently disinterested witness was O. J. Massey, Jr., vice president of the Bibb Brick Company and the Bibb Sewer Pipe Company, whose whole output Jelks had been purchasing. Mr. Massey testified that he regarded Mr. Jelks as worth from $150,000 to $200,-000, and a perfect risk financially.

Mr. Orville A. Park, whose enviable standing as a member of the bar is widely known, was present at the negotiations about liquidation, as the general counsel of the American National and the Continental Trust Company. He also was called upon to testify. "In going over the assets of the Commercial National," he states, "we kept three lists of papers. The paper was being classified by the officers as it was being called out. The Jelks' paper was put, without the slightest hesitancy, as A No. 1 prime paper, that being the highest classification." During the course of the evening, Mr. Park said the question was asked, "Whose were some of the principal loans?" Among others it was stated Mr. Jelks owed the bank somewhere about $100,000, but that a good portion of it was secured; that a good deal of it consisted of accepted drafts, or commercial paper of that sort, bills of exchange, things like that, bills in transit and all. He further testified, "I still considered Mr. Jelks' paper as perfectly good, and so classed it." He further testified:

"The officers of the Continental Trust Company had nothing to do with determining which officers or directors would guarantee, or the amount of their individual guaranty, or how the guaranty would.be secured. Mr. Jelks' guaranty was accepted right along with the rest of them."

He adds:

"There was no effort made to size up Mr. Jelks at all. There was no inventory of assets or liabilities taken. I did not know what Jelks owned. I knew, of course, he owned the Rivoli property. I knew he owned the Tampa property. I thought that that Tampa property was easily worth $60,000 or $75,000. I knew he was doing business in Jacksonville. I knew he was doing business in Macon, but the assets he had around in one place or another I did not undertake to know."

Mr. R. J. Taylor, president of the American National Bank, testified that he took the leading part in the negotiations which led up to the liquidation of the Commercial National and the Commercial Savings Bank by the American National and the Continental Trust Company. Mr. Taylor has long been a banker. He has great experience and is a man and banker of unquestioned excellence and integrity. Indeed, all the evidence of all these witnesses is reported by the referee in his finding, without the slightest question as to its truth. "When it came to Jelks' paper," says Mr. Taylor, "I recall that some one said that Jelks' paper was secured. I said, 'In what manner?' 'By acceptances.' When you put that up to a banking man, acceptance is

considered one of the best papers taken in a bank, recognized by the Federal Reserve Board, unlimited as to what you can take of that paper. The supposition is that the man that the shipment goes to and owes for the goods is a good man. You have got an acceptance of his; that is the idea. It is really a two-name paper. * * * I knew he was doing good business; I always heard he was making money. My dealings with him were such as to lead me to believe he was. I considered that one of the best papers. I think it had a great deal to do with my taking over the bank." Of Jelks, he adds:

"I thought he was perfectly solvent. I don't think I would have touched the Commercial National if I had not thought it, because Jelks and three or four other names made about $400,000 of their assets."

[1, 2] There will be found in the evidence reported the testimony of no witness to contradict this general belief of the solvency, and indeed, prosperity, of Mr. Jelks. The referee does not question it. The presumption which obtains, when there is an issue of fact, in favor of the finding of the referee on the facts, is therefore not material. There is no disputed fact. It is the conclusion of that learned official of the bankruptcy court, from the undisputed facts which constitutes the grievance of the Continental Trust Company. The referee concludes that because Jelks must have known his own insolvency when he conveyed the Rivoli property to the trust company, not to benefit his own creditors, but to secure that company against loss, in case the assets of the Commercial & Savings Bank in which he was a director proved insufficient to pay its liabilities, it was a violation of the relating clause of the Bankruptcy Act above referred to. But it is true, as shown by the citation of the referee, that the transaction so far as the purchaser (here, the Continental Trust Company) is concerned must be impugned, if at all, by *actual fraud* as distinguished from constructive fraud. Coder v. Arts, 213 U. S. 223, 224, 29 Sup. Ct. 436, 444 (53 L. Ed. 772, 16 Ann. Cas. 1008). Now the question of fraud depends upon the motive. See, also, Kerr on Fraud and Mistake, 196–201. "We are of the opinion," continued Mr. Justice Day in Coder v. Arts, for the unanimous court, that Congress in using the terms, in section 67e, "to hinder, delay, and defraud creditors," intended to adopt them in their well-known meaning as being aimed at conveyances *intended* to defraud. * * * Such transfers have been held to be only those which are actually fraudulent."

[3] It is impossible for the court to discover any actual purpose to defraud in a bank, which, on the note of a man generally believed solvent, and the pledge of property presumably adequate, proceeds to pay out thousands of dollars in order not to get a preference or benefit for itself, but to rescue another bank from utter failure, and all the banks of the city from that wild and disastrous panic which causes a "run" upon their vaults, from the incident and inevitable calamity to the business community. There were many guarantors of this fund, among them four National Banks in the city. The reasoning of the referee would have obliged the Continental Trust Company to have made close inquiry also into the assets of these banks. It would

charge the trust company with knowledge of all injurious facts which such inquiry might possibly have evolved. What greater reason was there for inquiry into the business condition of an individual guarantor whom every one deemed solvent? Besides, the logic of this reasoning on the part of the learned referee would oblige a bank to sift and investigate the assets of every indorser on its paper. With his accustomed acumen and assiduity, the referee has marshaled all the facts which such an investigation might have discovered in the business affairs of Mr. Jelks; but it is enough to support his deed if the trust company in good faith believed him solvent, and if, likewise in good faith, it had no thought of delaying or defrauding his creditors.

In connection with the leading case of Coder v. Arts, supra, we may be justified in considering the condensation of the principle as expressed in that case by the lucid and skillful editors of the Law. Edition, Supreme Court Reports:

"The necessary effect upon other creditors of a mortgage executed by an insolvent within four months of the filing of a petition in bankruptcy, to secure a pre-existing debt, does not dispense with the necessity of showing an actual intent on his part to hinder, delay, or defraud his creditors, which is essential under section 67e in order to avoid such mortgage, where the mortgagee was ignorant of the insolvency of the mortgagor, and had no reason to believe that a preference was intended."

A fortiori is this applicable where there is no pre-existing debt, where the consideration is present, valid, and the parties moved by a conscientious purpose to save a wavering bank and on the validity of the deed benefit the business community. And by the law of Georgia, a consideration is valid if any benefit accrues to him who makes the promise, or any injury to him who receives the promise. Park's Ann. Code, § 4242. See, also, Kimmerle v. Farr, 189 Fed. 295, 111 C. C. A. 27, and particularly Tumlin v. Bryan, 165 Fed. 166, 91 C. C. A. 200, 21 L. R. A. (N. S.) 960, opinion by the late Circuit Judge Shelby, pronounced by the Circuit Court of Appeals for the Fifth Circuit. Also, First National Bank v. Abbott, 165 Fed. 852, 91 C. C. A. 538; Grant v. First National Bank, 97 U. S. 80, 24 L. Ed. 971; Rosenman v. Coppard, 228 Fed. 114, —— C. C. A. ——, Circuit Court of Appeals for the Fifth Circuit, decision at the present term.

A number of authorities have been cited by the learned counsel for the trustee, which he regards as inimical to this view. The first of these is In re Pease (D. C.) 129 Fed. 447, 448. In that case, however, it is found that the purpose of the trust company was to aid the seller in perpetrating a fraud upon his creditors. The case is distinguished by the court from Tiffany v. Boatman's Institution, 18 Wall. 375, 21 L. Ed. 868. In the latter and controlling case, the court upheld the validity of the loan to one Darby, who is described as, "A man of large property and large debts," and "of wonderful energy and capacity for business." That is an accurate portraiture of Jelks at the time the deed assailed was made. Darby borrowed the money to take valuable security out of pledge, and to prevent their sacrifice; neither he nor the other contemplated any fraud upon creditors, and besides, in Pease's Case, there was an unknown country merchant doing business in a small village, confessedly and obviously unable to pay either his business indebtedness, or long-standing debts of borrowed capital.

In Re Lynden Mercantile Co. (D. C.) 156 Fed. 713, also cited for the trustee, there appeared—

"in the negotiations and in the culmination of the transaction a manifest intention to not give any opportunity for other creditors to secure a preference ahead of the bank."

Besides, there was a payment of an overdraft amounting to more than $2,000 for a past consideration, and a note for $130 not then due.

In Toof v. Martin, 13 Wall. 48, 20 L. Ed. 481, also relied upon for the trustee, Mr. Justice Field, for the court, states:

"In the present case, the bankrupts were insolvent in both senses of the term at the time the conveyances in controversy were made. They did not then possess sufficient property, even upon their own estimation of its value as given in their schedules, to pay their debts. These exceeded the estimated value of the property by over $20,000, and for months previous the bankrupts had failed to meet their obligations as they matured. The creditors had pressed for payment without success. Their stock of goods had been levied on, and their store closed by the sheriff under an execution on a judgment against one of them."

The learned Associate Justice appends the obvious conclusion:

"It would serve no useful purpose to state in detail the evidence contained in the record which relates to their condition. It is enough to say that it abundantly establishes their hopeless insolvency."

In the Merchants' National Bank v. Cook, 95 U. S. 344, 24 L. Ed. 412, Mr. Associate Justice Hunt, for the court, observes:

"The president of the bank testifies that there was nothing in the note sent with the securities, or in the transaction itself, that led him to suspect the insolvency of Homans."

He adds:

"While it is impossible certainly to indicate the operation of the human mind, we cannot but think the witness is largely at fault in his recollection, and that his idea at the time of testifying was not the one that controlled his action when the occurrence took place."

In Newport Bank v. Herkimer Bank, 225 U. S. 178, 32 Sup. Ct. 633, 56 L. Ed. 1042, the two concerns between which the preference was made were in the same hands. One had made the conveyance of all its assets to the other, but under the facts of the case, as set forth in the opinion by Associate Justice Hughes, it is held that the trustee failed to establish any right to recover.

Unusual stress was placed by the learned counsel for the trustee on Monroe Mercantile Co. v. Arnold, 108 Ga. 449, 34 S. E. 176. There, however, the court was construing the state statute and not the bankruptcy law. There was a verdict of a jury, in which that body answered, in a somewhat embarrassing fashion, the large number of questions propounded to it in accordance with the Georgia practice. The court proceeds, with much carefulness and clarity, to interpret the somewhat multifarious verdict. The jury had found that there was no intent to defraud, but an intent to delay. The court held that part of the loan was an antecedent debt, that the mortgage was therefore void; and as for the rest, the case went off on the proposition that the

individual action of certain directors in executing the mortgage was not the action of the corporation itself. This view was amply supported by the authority cited. This laid the axe to the root of the tree. Since the execution of the mortgage was wholly unauthorized, it was necessarily held invalid. It follows that the views expressed by the learned Justice, pronouncing opinion to the effect that the mortgage was fraudulent and seems not essential to the decision, may, perhaps, be regarded as obiter, and the authority of the precedent in illustrating the question before this court may then be to some extent diminished.

Did the case before this court involve an issue of fact, we would be exceedingly loth to disturb the finding of the very able and efficient referee. We, however, cannot agree with the conclusion he has drawn from the undisputed facts, and therefore hold that conclusion should be reversed and the lien of the trust company sustained. There is a stipulation filed by counsel for the trust company and the trustee that this holding is not to conclude any right of procedure or any equity set forth or sought in an intervention of Mrs. Lena P. Jelks, which has not yet been heard.

Let decree be taken in accordance herewith.