## ELLIOTTE v. AMERICAN SAV. BANK & TRUST CO.

Circuit Court of Appeals, Sixth Circuit.
April 8, 1927.

No. 4746.

1. **Bankruptcy �824303(4)—On evidence, payments to bank within four months before bankruptcy from deposits held not preferential (Bankruptcy Act, § 60b [Comp. St. § 9644]).**

In action by trustee in bankruptcy, under Bankruptcy Act, § 60b (Comp. St. § 9644), to recover preferential payments to bank holding bankrupt's notes, within four months of bankruptcy, payments from deposits made in regular course of business *held* not preferential, in view of evidence.

2. **Bankruptcy �824166(4⅜)—Bank holding notes of bankrupt before bankruptcy has lien on deposits in regular course of business, unless it had reasonable right to believe preference would be effected.**

Bank holding notes of bankrupt prior to bankruptcy, in absence of fraud or collusion, has lien on and right of set-off against deposits in regular course of business, effect of which is not destroyed by fact that depositors' voluntary checks are given for payment; but such right does not apply to deposits not received in regular course of business, nor to those received when bank had reasonable right to believe preference would be effected.

3. **Bankruptcy �824303(4)—Payments to bank just before bankruptcy, on large overdraft against bank deposit held preferential, in view of evidence (Bankruptcy Act, § 60b [Comp. St. § 9644]).**

In action by trustee in bankruptcy, under Bankruptcy Act, § 60b (Comp. St. § 9644), to recover preferential payments to bank holding bankrupt's notes, within four months of bankruptcy, payment just before bankruptcy, account applied on large overdraft of deposit account, *held* preferential, in view of evidence, especially in view of bank's failure to make inquiry as to bankrupt's final condition.

4. **Bankruptcy �824168—Trustee in bankruptcy may recover interest on preferential payment from date of commencement of action.**

Commencement of action by trustee in bankruptcy to recover preferential payment is demand, and he may recover interest from that time.

Appeal from the District Court of the United States for the Western District of Tennessee; Harry B. Anderson, Judge.

Action by C. H. Elliotte, trustee in bankruptcy of the estate of Levi & Grief, bankrupts, against the American Savings Bank & Trust Company, to recover the amount of alleged preferential payments. From a decree dismissing the bill, plaintiff appeals. Reversed and remanded, with directions.

Lowell W. Taylor, of Memphis, Tenn. (W. Percy McDonald, of Memphis, Tenn., on the brief), for appellant.

Hamilton E. Little, of Memphis, Tenn. (Holmes & Canale, of Memphis, Tenn., on the brief), for appellee.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. Plaintiff appellant, as trustee in bankruptcy of the above-named estate, brought this suit under section 60b of the Bankruptcy Act (Comp. St. § 9644) to recover $11,500, the aggregate of nine alleged preferential payments received within four months of bankruptcy (December 31, 1924), viz. on and after November 3, 1924. On final hearing on pleadings and proofs the bill was dismissed. This appeal is from that action.

Bankrupts had for many years been customers of the defendant bank, and in 1924 had a line of credit therewith amounting to $26,500, represented by a series of promissory notes with definite maturities—usually 60 and 90 day paper. The bank held no indorsements other than that of the bankrupts, and no other security except life insurance policies having a surrender value of between $5,000 and $6,000.

In the summer of 1924 bankrupts, at the bank's request, agreed to reduce the indebtedness one-half between September 1st and January 1st then next. It was recognized that payments were not practicable during the quiet summer season. Although the bankrupts deposited in the bank $20,000 during September and $31,000 during October, no payment was made in either of those months on the bank's indebtedness. The bank account was kept practically exhausted by the

bankrupts' payments to merchandise creditors. On November 3, 1924, $1,000 was paid on the bank's debt. During November the bankrupts' deposits in the bank were about $28,000, and during December about $32,000, making a total of deposits of about $111,000 during September, October, November, and December. On November 28th, at the bank's instance, a definite maturity note for $4,000 was renewed by a demand note in the same amount, and, apparently in that connection, $500 was paid on the bank's paper on November 29th. On the 3d, 8th, and 12th of December, similar demand renewals of time paper were had as the latter matured—respectively for $1,500, $3,000, and $6,000, making a total of renewals by demand notes of time paper amounting to $14,500 during practically 30 days, in addition to the aggregate payments of $1,500 on November 3d and November 29th. There was paid on the bank's paper between December 1st and December 22d (six payments) a total of $7,000. On December 24th the bank charged to the bankrupts' account the $3,000 demand note, thus overdrawing the bank account by $2,400.79. During the seven remaining days before bankruptcy, deposits made by the bankrupts were applied by the bank to the extinguishment of this overdraft. On the $26,500 line of bank paper there remained unpaid at bankruptcy $15,000, consisting of two demand notes, for $4,000 and $6,000 respectively, given since November 29, 1924, and a note for $5,000, given before that date, and due January 3d following.

The bankrupts owed substantially $100,000. The assets of the estate were a stock of merchandise, consisting of broken line, odds and ends, much of which were shopworn and old, together with fixtures and open accounts amounting at face to about $20,000. At trustee's sale the merchandise and fixtures brought $29,500; the trustee testified that in his opinion that was the best sale ever made in the jurisdiction of the bankruptcy court. No definite evidence was given of the value of the open accounts. But, more than a year after bankruptcy, the trustee testified, without dispute, that he had been able to collect about $2,000 thereon, and that the estate could not pay to unsecured creditors more than 30 per cent. of their claims. It is stipulated that there had been no change in the bankrupts' financial condition during the two months before bankruptcy.

[1, 2] 1. It is not clear that the payments to the bank previous to December 25 were preferential within the meaning of the Bankruptcy Act. The only testimony on the merits was that of the bank's president, who was called as a witness for plaintiff. If his testimony is given full credence, it would repel the claim that the bank had, substantially before that date, reason to believe that the payments made would effect a preference. The fact that the bank insisted upon the reduction of the line by one-half and on renewing the time paper by demand notes, considered in connection with the fact that, to begin with, at least, the bank was willing to continue the line at such reduced amount, is not necessarily inconsistent with a belief on the part of the bank of the solvency of the bankrupts, who had been customers of the bank for many years, and during the fall months were apparently doing at least a fairly good business, as evidenced by the bank deposits of about $111,000 in the four fall months, the great bulk of which was paid to merchandise creditors, a fact apparently known to the bank, and tending to negative a realization by the bankrupts of impending failure. Moreover, during the period we are considering, the bank was paid upon the notes only about 8 per cent. of the deposits, and the credit line reduced about one-third, although the average monthly deposits were more than the bankrupts' entire line of bank credit. Further, throughout the period we are now considering the deposits were made *in the regular course of business,* and, in the absence of fraud or collusion between the bank and the bankrupts with a view of creating a preferential transfer (Bank v. Massey, 192 U. S. 138, 148, 24 S. Ct. 199, 48 L. Ed. 380), the bank had a lien thereon and a right of set-off thereunder, the effect of which was not destroyed by the fact that the depositors' voluntary checks were taken for payments on the bank's paper, instead of applying the deposits directly thereon (Studley v. Boylston Bank, 229 U. S. 523, 526, 33 S. Ct. 806, 57 L. Ed. 1313; Toof v. Bank [C. C. A. 6] 206 F. 250, 252; American Bank, etc., Co. v. Coppard [C. C. A. 5] 227 F. 597; Walsh v. Bank [C. C. A. 6] 201 F. 522). While there are considerations, which, standing alone, would suggest that even *during this period* the bank had suspicions of the bankrupts' solvency, yet not only does mere suspicion not amount to proof of reasonable cause to believe, but, considering the entire case, we are better content with the conclusion that the trustee has not sustained the burden of showing that the payments previous to December 25 were preferential.

[3] 2. As to the payments received after the

latter date the situation is quite different. On December 24th, the bankrupts' outstanding paper amounted to $18,000, which was nearly $5,000 more than the bank had been willing to carry. The time for reducing to the 50 per cent. limit would expire on December 31st. The holiday season alone intervened. Of this $18,000 remaining indebtedness, $13,000 was demand paper; the remaining $5,000 was time paper, to mature January 3, 1925. During December the payment of bankrupts' checks had caused, at various times, small overdrafts. But on December 24, the day before Christmas, when the bankrupts' credit balance was about $600, the demand note for $3,000 was charged to the deposit account, thus not only wiping out the previously existing credit balance, but leaving an overdraft of $2,400.79, which, so far as appears, or as is inferable from the record, would seem to be many times larger than had ever before been made. We think this action by the bank can reasonably be accounted for only on the theory that the bank had concluded that the bankrupts could not pay out, and had determined to get what it could.[1]

It cannot well be doubted that the bank had by December 24th been fairly put on inquiry as to bankrupts' financial condition, nor that reasonable inquiry would have disclosed insolvency. The bank's president testified that he made no inquiries as to the condition of the bankrupts' business during December, and did not believe they were furnished with a financial statement at all in 1924, and did not believe the bank asked for one during that year. The lack of such inquiry would seem unnatural, unless the bank had such information as to make inquiry unnecessary. It is now evident that the confiscation of the bankrupts' bank balance, and of the immediately ensuing deposits

of $2,400.79, was bound to put an end to the bankrupts' business, and that the petition in bankruptcy filed by the bankrupts on December 31st was the logical and naturally to be expected result. Cf. Kimmerle v. Farr (C. C. A. 6) 189 F. 295, 298.

Moreover, the deposits applied to the reduction of the overdraft of $2,400.79 were not *received by the bank in due course*. Following the overdraft, speedy bankruptcy was inevitable, and could not well have failed to be so understood by both the bankrupts and the bank, and the bank's right of set-off did not apply to deposits not received in the regular course of business, but received merely for the purpose of application on a pre-existing debt. Union Trust Co. v. Peck (C. C. A. 4) 16 F.(2d) 986, 987; Essex Bank v. Hurley (C. C. A. 1) 16 F.(2d) 427, 428. Cf. Merrimack Bank v. Bailey, infra, 289 F. 468. Nor to deposits received within the four months' period, when the depositor was insolvent, and when the bank had reasonable cause to believe that such deposits would effect a preference. Merrimack Bank v. Bailey (C. C. A. 1) 289 F. 468, certiorari denied by the Supreme Court, 263 U. S. 704, 44 S. Ct. 33, 68 L. Ed. 515. So far as reasonable cause on the part of the bank to believe that preferences were obtained may be thought necessary to recovery, we think the circumstances constrain us to find the existence of such reasonable cause.

[4] The decree of the District Court is accordingly reversed, and the record remanded to that court, with directions to enter a new decree, adjudging recovery by the trustee against the bank of $2,400.79, plus interest thereon at the Tennessee rate from the date of commencement of this suit. Kaufman v. Tredway, 195 U. S. 271, 273, 25 S. Ct. 33, 49 L. Ed. 190.

---

[1] It is not without interest to note that the bank's president admitted that in the latter part of December, and before the 24th (the witness would not say that it was not on December 22d) Mr. Goodall Grief, a son of Mr. Dan Grief, of the firm of Levi & Grief, called on the bank's president at the bank "and seemed very much worried about the office; was telling me he had some bookkeepers there, and one thing and another, and that they were stealing from him. That is all the conversations." A little later defendant's counsel thus stated the admission of the bank's president, viz. "that Mr. Goodall Grief came there, and said things were not going good at the office and that he thought there was some speculation [peculation?], petty speculation [peculation?] going on; even went so far as to tell Mr. Cohn, at that time, that Mr. Levi was running over his father, and little internal frictions there."