## TEAL *v.* BILBY.

## SAME *v.* SAME.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

Argued November 4, 7, 1887. — Decided December 5, 1887.

The court below acted properly in ordering the consolidation and trial together of an action of replevin and an action in contract, the parties being the same in both, their rights depending upon the same contract, and the testimony in each being pertinent in the other.

It is competent for parties who have contracted in writing with reference to personal property to make a subsequent verbal agreement as a substitute for a part of the written contract.

When testimony is permitted to go to the jury without any objection, tending to show that changes had been made orally in a written contract between the parties, which were substituted by them in the place of the written contract, it is too late to contend that the jury cannot find, in case it is so proved, that the rights of the parties, as defined in the written contract, have been varied by the verbal agreement.

The burden of proof to establish it is on the party who sets up an oral change in a written agreement; and in determining it the reasons and motives for the alleged change may be shown.

In an agreement to keep, feed, and care for a quantity of cattle, it was agreed that the cattle should be of a certain average, of which fact A was to be the judge. *Held*, that A's action in this respect was not conclusive on the defendant if it was shown that he had been deceived by the plaintiff, in not putting him in full possession of knowledge possessed by him, and necessary for the proper discharge of A's duty.

In several other respects, referred to by the court in detail, it is found that there was no error in the charge of the court below.

THE plaintiff below sued out these writs of error. The case is stated in the opinion of the court.

*Mr. Attorney General* for plaintiffs in error. *Mr. James S. Botsford* was with him on the brief.

*Mr. James Hagerman* for defendant in error. *Mr. William Warner* and *Mr. O. H. Dean* were with him on the brief.

MR. JUSTICE MILLER delivered the opinion of the court.

These are separate actions brought by the same plaintiffs against the same defendant in the Circuit Court of the United States for the Western District of Missouri.

The first was an action of replevin, under which the plaintiffs got possession of 1232 head of cattle, and the second was an action to recover damages for a failure on the part of defendant to fulfil a contract of agistment with regard to the same cattle. As the rights of the parties depended upon the same contract, and as the testimony in each case was pertinent in the other, the court very properly ordered their consolidation and trial together before the same jury. The testimony submitted to the jury on both sides of the controversy is embodied in a single bill of exceptions under the introductory phrase that each party offered testimony tending to prove such and such facts. This bill of exceptions is very voluminous, consisting of a great variety of evidence running through twenty-eight pages of printed matter, and to none of it does there appear to have been any objection offered by either party. The questions presented in the record are exclusively upon the charge of the judge to the jury, on exceptions taken by the plaintiffs below, who are also plaintiffs here, and to the refusal of the court to grant such instructions as the plaintiffs' counsel prayed for.

A verdict was rendered for the defendant, holding that he was entitled to the return of the property replevied from him, or to the sum of $23,835.12, which was found by the jury to be the value of his interest in the property. In regard to the other suit the verdict of the jury was simply for the defendant.

Judgments were rendered in accordance with these verdicts, to which the present writs of error are prosecuted.

It seems from the evidence that the plaintiffs, under the partnership style of J. Teal & Company, were owners of about 3000 head of cattle, which they had driven across the plains from Oregon to a shipping point on the Union Pacific Railroad, called Rock Creek Station, in Wyoming Territory. These cattle were shipped from this point to Council Bluffs, in the State of Iowa, between the 14th day of October and the 10th day of November, 1880. On the 3d day of November of that year Teal & Company entered into a written contract with John S. Bilby, of Nodaway County, Missouri, by which Bilby agreed to keep, feed, and care for 1500 of these cattle until December 1, 1881. By this instrument he agreed that he would so feed and care for them that they would increase in weight 450 pounds each, on an average, for which the plaintiffs were to pay him, on their delivery to them, at the rate of five cents per pound for such increase.

It also appears that before the terms of this agreement were decided upon one lot of about 200 cattle had arrived at Council Bluffs, and had been seen by Bilby. It was a part of the agreement that the remainder, as they arrived, should be average lots with those that Bilby had seen, of which fact Mr. Bass, of the firm of Rosenbaum, Bass & Co., who resided at Council Bluffs, was to be the judge. The expense of transporting the cattle to Dawsonville, Missouri, where Mr. Bilby resided, was to be paid by plaintiffs; but if Mr. Bilby should pay any of that expense, he was to be repaid with ten per cent interest upon his money on final settlement.

There is also evidence to show that Mr. Bilby was a man of means, owning extensive lands in the neighborhood of Dawsonville, and accustomed to the business of feeding cattle; and the agreement was that the cattle should be weighed at Dawsonville, or the nearest scales thereto, upon their arrival, under circumstances minutely provided for, and that Bilby contracted " to take the cattle and winter them well on hay, straw and stalk fields until grass comes; to be kept in enclosed pastures on good grass until the 15th of August, 1881, after

which date, on each and every day, they shall be fed all the corn they will eat until delivered to J. Teal & Company;" and that the cattle were to be re-delivered to the plaintiff between the 15th day of October and the 1st day of December, 1881, by giving ten days' notice. Bilby was also to be responsible for all cattle lost, strayed, or stolen, and for any dying through his neglect or carelessness; but if any died through causes which were unavoidable, the loss of such cattle was to be borne by Teal & Company, and the loss of the feed by Bilby.

Another provision to which some importance is attached is in the following language: "If any steers die John S. Bilby shall preserve the hides as evidence of death, and the ears if there are any ear-marks."

It is agreed that 268 of these cattle were not recovered by plaintiffs under the writ of replevin, nor were they tendered by Bilby under the tender which he sets up in his answer; nor did the weight of the cattle at the time Bilby was ready to deliver them, or offered to deliver them, or at the time they were replevied, come up to that which was required to make the increase of 450 pounds each on an average. It is on the ground of this failure to bring the cattle up to the contract weight, alleging that it was the fault of Bilby in not giving sufficient care and attention to them, as well as want of proper feed according to the contract, by reason of which a part of the 268 died and were lost, that the plaintiffs assume that they have a right to recover possession of the property without making any compensation to Bilby for his services.

A large amount of testimony was submitted to the jury on both sides with regard to this question of proper feeding, care, and attention, without objection apparently by either party, as well as instructions asked of the court to the jury upon these subjects, and the consequences of the supposed failure on the part of Bilby to comply with his contract. The exceptions taken to the general charge of the judge are also numerous, and many of them too unimportant to receive special notice at our hands.

A principal question, and the most important one in the

case, arises out of the fact that Bilby gave testimony of a subsequent oral agreement changing very materially the terms of the written contract. The bill of exceptions which relates to the evidence introduced on this subject reads as follows :

"The defendant introduced evidence tending to show that the appearance of the cattle when they were delivered to him by the plaintiffs would not disclose the treatment they had received previously, and that it required time to develop the evil effects of such treatment ; that although the cattle might appear to be very thin and weak, yet it would not be apparent that they were diseased; on the contrary, experienced cattle men might well suppose that they would, upon the treatment provided for in the contract, soon recover their flesh and strength.

"He also introduced testimony tending to show, not only the death of two hundred and sixty eight of the cattle as aforesaid, but that as to many of the others that survived the winter of 1880 and 1881, although they were fed upon corn, all they could eat during the winter, they always presented a scabby appearance and did not thrive from their food, and that when the spring came they were placed upon grass. They did not shed their hair, but were, in the language of a number of the witnesses, 'stuck cattle.'

"And that upon an examination of the cattle, it was considered by said Coleman and defendant that the cattle could not be wintered on hay, straw, and stalk fields, and it was a few days thereafter finally agreed upon between Coleman and defendant that defendant should let the cattle into corn, and whatever time they went into corn that winter should be deducted off of the corn feed next year at the end of the next grain feeding, and that defendant should also be released from the stipulation of the written contract requiring him to increase the average weight of the cattle four hundred and fifty pounds per head."

While this testimony does not seem to have been objected to at the time it was offered and permitted to go to the jury, the counsel of plaintiffs in error, in several prayers for instructions to the jury, and in objections made to what the court said

to the jury, set forth the proposition, that this being an attempt to substitute a verbal contract, or change of contract, for a written one, it must be made clear that, so far as it changed the obligation of Bilby, it was made upon a good consideration; and they in various ways object to the rights of the parties being governed by this supposed change in the contract. It is an answer to a very large amount of what is said on this subject that the testimony in regard to it was permitted to go to the jury, as given by Bilby on the stand. Coleman, one of the plaintiffs, also testified in regard to this, and denied that the agreement was as stated by Bilby; and a third witness was introduced on this subject, who was present at the conversations in which the change in the agreement is said to have been made. The whole testimony upon this subject was, therefore, before the jury without objection.

It further appears that Coleman, whose interest in the cattle was as large as any of the plaintiffs', substantially remained with them during the whole period from the time they were delivered to Bilby until their replevin. Part of this time he was at Bilby's house, and the remainder somewhere in the neighborhood, giving his attention closely to the cattle, as one of the plaintiffs, who were the real owners.

It is also manifest, from the testimony offered, that the cattle were not in good condition to go through the winter without other food than the hay, straw, and stalk fields, which was all that Bilby was bound to furnish them, until grass came in the spring, but that some other kind of food was necessary to prepare them for this. Of this Coleman, who was present superintending them and had a right to control the matter, was the best judge, and the most interested. It must also have been apparent to Bilby, that, if the cattle entered upon the grass in the spring in an enfeebled condition, or if many of them died during the winter, he would not be able to return them in October or December with an average increase of 450 pounds, according to the contract. It was, therefore, to the mutual interest of the parties to make some different arrangements, by which Bilby should furnish the cattle more nutritious food during the autumn and winter, and that he should

also, in consideration of that change, be. relieved of his obligation to bring them up to an average increase of 450 pounds.

It is hardly pretended by counsel for plaintiffs that it was not competent, after the written contract was made and signed by the parties, for them to make another verbal contract in regard to some parts of it, which to that extent should be a substitute for the first one. There is nothing in the nature of the contract itself requiring it to be in writing, nor is there any principle making it necessary that the new one should be reduced to writing because the first was written. 1 Greenleaf on Evidence, § 303; *Goss* v. *Nugent*, 5 B. & Ad. 58; *Lattimore* v. *Harsen*, 14 Johns. 330; *Munroe* v. *Perkins*, 9 Pick. 298.

What the judge said to the jury on the subject of the modification of the contract is in substance as follows: that it was set up by Bilby, and he was bound to prove it; that the written contract must prevail unless a change or modification of its terms is proved to your satisfaction; you should inquire whether there was a reason or necessity for the change; the parties alike interested in preserving the cattle were upon the ground; the cattle were dying in large numbers from some cause; would a change of food suggest itself to meet the contingency? If so, there would be a reason and a motive for that change. He then recites what Bilby says about the contract, and Coleman's denial of it, and that an unimpeached witness was called by Bilby to whom Bilby had repeated the agreement in the presence of Coleman; that a number of witnesses testify the cattle were put upon corn about the time that the change was claimed to have been made in the contract; and other testimony was given of the acts, conversations, and admissions of the parties, both for and against the change. From all this, he says, you must determine whether there was any change, and if you find that there was, what it was; if you find, however, that there was no modification or change, then the written contract remained in full force.

We are of opinion that this charge, the substance of which only is given by us, fairly placed before the jury the law which governed the proof and effect of that contract in the case, and that no other instructions upon that subject were necessary to

enable them to arrive at a just verdict, so far as that was affected by the supposed change of contract.

Another error is alleged in regard to the charge of the court, and its refusal to grant prayers for instructions by the plaintiff relative to the conclusiveness of Bass' action in passing upon the cattle as they arrived at Council Bluffs, as being average lots with the train load which had already arrived and been seen by Mr. Bilby. A portion of the testimony which we have already cited tended to show that, when the cattle were delivered to Bilby by the plaintiffs, their appearance would not disclose the bad treatment they had previously received, but that it required time to develop the evil effects of such treatment. Much other testimony was introduced on the same subject tending to show that Bass was misled as to the real condition of the cattle when he inspected them, and also that he was influenced by partiality toward plaintiffs, who employed him, not only in regard to the cattle now in controversy, but other cattle, as a broker or agent.

To the reception of all this testimony there is no exception, and it affords sufficient reason, in our opinion, why the court should not have charged peremptorily, as requested by plaintiffs, that Bass' examination of these cattle and passing them was conclusive that they were in proper condition and came up to the requirements of the contract. We think it was a question for the jury, under all the circumstances, to decide whether they were equal to the lot first examined by Bilby.

On that subject the judge said to the jury:

"It is only in case Bass was himself deceived by plaintiffs, in not putting him, Bass, in full possession of the knowledge possessed by them, and necessary for proper discharge of his, Bass', duties as arbitrator, that you can go behind Bass' acts. Then, if the cattle of the Teal herd were infected by a disease incurred by careless handling, want of sufficient or proper food or water, and such disease could not be discovered by a careful examination, which Bass is presumed to have made, in such a case the plaintiffs were bound, if they knew of such disease, to disclose it to Bass or Bilby, and their failure to do so was a fraud upon Bilby; and if damages have resulted to him, Bilby, in consequence, he is entitled to recover them in this action."

We see no objection to this charge, which is the one complained of by plaintiffs in error.

A third question, to which some importance is attached, arises out of the language of the contract, and the action of Bilby under it, in regard to the hides of the cattle which should die while they were under his control. This language, which immediately succeeds the agreement as to the responsibility for cattle lost, strayed or stolen, or dying through the neglect or carelessness of Bilby, is as follows : "If any steers shall die, John S. Bilby shall preserve the hides as evidence of death, and the ears if there are any ear-marks." Of the 268 steers not on hand at the time Bilby proposed to deliver the remainder of the cattle to the plaintiffs, the hides were not produced. It is insisted by plaintiffs that the failure to produce these hides makes him responsible for the value of the steers. Evidence, however, was offered by Bilby tending to show that during the winter in which these cattle died he had produced the hides to Coleman, counted them to him, and requested him to accept the delivery of them. There was also testimony to prove that during the succeeding summer the hides decayed and became offensive, and could not be produced at the time the cattle were to be delivered.

The question of these hides is considered in two aspects by the court in its charge to the jury, and in both we think it is justly treated. The first charge, which related to the evidence of the hides as tending to show the loss of the cattle which Bilby was otherwise bound to account for, is in the following language:

"Bilby, under the written contract, was to preserve the hides of the cattle which died and the ears of any which had ear-marks. Under this provision Bilby was bound to preserve the hides of all the cattle which died; and unless he has done so, he is bound to account for the whole of the 1500 cattle, less such as he has preserved the hides of, or the preservation of them was agreed to be waived.

"There is testimony showing the number of hides preserved by Bilby, and as to an agreement with plaintiff Coleman waiving the preserving of some of them. If the whole of

the steers which are claimed to have died have thus been accounted for to your satisfaction, Bilby cannot be held responsible, provided they all died through unavoidable causes, and not through the neglect or carelessness of Bilby, as already instructed. The offer to count the hides claimed by Bilby to have been made to Coleman, if made as claimed, and the count actually made as testified to, if satisfactorily proven, may be taken by you as showing that Bilby had the number of hides claimed. There are no provisions in the contract where the hides of cattle which had died should be counted, and the reasonable construction thereupon is, that the hides preserved should be counted at the time, and with a view of making the hides themselves available for use or sale."

In charging the jury in reference to the damages which the plaintiffs might recover, he afterwards said : "Under the written contract, the plaintiffs are entitled to the hides of the cattle which unavoidably died. Unless you find that a tender of these was made by defendant to plaintiffs, in which latter case the defendant would not be liable for them, there is no proof before you as to the value of the hides, and in order to recover their value the plaintiffs would have to show it; the hides seem to be out of the question even if defendant's tender was invalid."

It is seriously urged in argument by counsel that this latter charge concerning the value of the hides was misleading, as tending to divert the jury from the consideration of the failure to produce the hides as evidence of the death and loss of the cattle, and exempting Bilby from responsibility for these cattle. But it is too clear for argument, that, in that part of the charge first cited, he points their attention to that aspect of the failure to produce the hides, and to the considerations which should govern the jury in that respect, in charging Bilby or in releasing him from responsibility for their loss; while in the second and later part of the charge, he is considering the mere moneyed value of the hides, and charges the jury that the plaintiffs cannot recover for that, because they have made no proof of such value.

While there are other assignments of error that have been

examined by us, we do not perceive that any of them are well founded, nor do we think that they are worthy of an extended inquiry. As these, to which we have adverted, are the most important, and as we see no error in what the court charged or refused to charge the jury on these subjects, and as we have already said there is no exception to the introduction of testimony, we see no error in the record, and the judgment of the court below is, in each case,

*Affirmed.*