# Richmond

## PHOENIX INDEMNITY COMPANY v. HENRY W. ANDERSON & LEGH R. POWELL, RECEIVERS, ETC.

April 28, 1938.

Present, All the Justices.

The opinion states the case.

*Eastwood D. Herbert,* for the plaintiff in error.

*William G. Maupin,* for the defendants in error.

HOLT, J., delivered the opinion of the court.

The Royall Grocery Company is a North Carolina corporation doing business at Wake Forest. William L. Royall is its secretary and treasurer. T. F. Johnson, in one place, describes himself as assistant manager of the store and elsewhere he said that "I was called the manager. I was really manager, but I worked for Mr. Royall. He was my boss, in other words."

This corporation owned a half ton Ford truck. Two or three times a week, Royall would send Johnson in it to Raleigh to purchase fresh vegetables for the Wake Forest store. They would be brought in the early morning by farmers from the surrounding country to the city market, and it was from them that purchases were made by Johnson with money given him for that purpose by Royall. Sometimes Johnson would start in the early morning, and sometimes he would start late in the evening, after business hours, in order that he might spend the night with his brother who lived in Raleigh and make an early return to Wake Forest, sixteen miles away. His duty, and his only duty, was to purchase these fresh vegetables and to bring them still fresh to the Wake Forest store.

On the evening of November 8, 1935, Royall, in accordance with an established custom, gave Johnson money and sent him to Raleigh to make purchases for tomorrow's trade. The Wake Forest store closed at half past six. Johnson ate dinner at home and then drove straight to his brother's house, which he reached somewhere between 7:00 and 8:00 o'clock. Within about an hour he left it and went to the market to see if he could pick up bargains already there. He bought nothing but drank to an extent not stated. Thereafter he started to return to his brother's house but chanced to remember a friend, Bobbitt, who had once driven a truck for the Royall Grocery Company but who had been discharged and was then working at Staubt's bakery. Bobbitt was at work and did not get off until 11:00 o'clock. They then went in Bobbitt's car to a "nip joint," where

they took a drink, and from there to a cafe for lunch. Bobbitt went back to his work and Johnson to his truck parked near the bakery. He turned into Hillsboro street and to his left instead of to his right, which would have taken him back to his brother's home; "I discovered my mistake after I had gone several blocks, and I decided that I did not want to go home then, so I continued to ride," out towards Durham on United States highway No. 1, until he reached a point about five and one-half miles from the State Capitol, when he ran off the road and into an instrument case which operated crossing signals at Thompson's crossing on the Seaboard Air Line, doing damage in amount $1,108.32.

Johnson moved to Virginia, and an action was brought against him in the Circuit Court of Newport News, where judgment was obtained on which execution has issued in vain. Plaintiff in error defended that action under a stipulation that liability was not conceded. Afterwards, this action was instituted against it.

■ The policy itself is a North Carolina contract, and the accident suffered occurred in that State. Concededly, we are governed by the substantive law of that State.

This policy was in effect for one year from January 10, 1935. As issued, it covered another half ton Ford truck but was shifted to that which did the damage by an endorsement attached to the policy of date March 8, 1935, and is limited in its coverage to "the use thereof as herein stated." The first paragraph of the policy itself reads:

The insurance carrier "does hereby agree with the named assured, subject to the limitations and conditions herein contained, as respects accidents occurring within the territorial limits of the United States of America, Hawaii, and in Canada, while this policy is in force, by reason of the ownership or maintenance of any automobile described in statement 4 and the use thereof as herein stated, including accidents occurring by reason of and during the loading and unloading of such automobile."

What are the uses herein stated?

We turn to "Section III—Statements," itself subdivided. Section 1 tells us that assured's occupation is that of business or merchant. Section 5 limits the uses to which commercial automobiles may be put: "Commercial automobiles —Only in the business described in Statement I, except as follows: No exceptions." That is to say, these commercial trucks are to be used only by the named assured in its business as merchant, and the transfer slip of March 8, 1935, which shifted coverage from one truck to another, again designates its use as commercial, while subsection 8 of "Section I—Agreements" limits coverage to uses "with the permission of the named assured;" that is, to such permission as might be given by the Grocery Company.

We have here a policy which covers only uses in the policy stated. The vehicle insured is described as a commercial one, and it was in this business that this truck was to be used.

Accurately speaking, Johnson was not using this truck with permission at all. He was ordered to take it to Raleigh, load it up with produce purchased at the city market there and return to Wake Forest early the next morning. The only permission which he had was permission to do those things which he was instructed to do. He was never given permission to use this truck "for his own personal business or pleasure," and his only liberty of action was that he might go to his brother's the night before, keep the truck in his brother's garage, spend the night with him and return early the next morning; or to go to Raleigh sufficiently early in the morning to enable him to return with the produce to be offered in that day's business. Royall tells us that on the 8th of November "he told me about his twin brother here, who had a garage; and all he asked me was whether it would be all right for him to come to Raleigh, keep the truck in his brother's garage, and get the vegetables early the next morning and return to Wake Forest;" and that the permission was given "for the particular purpose of transacting your (the company's) business," and "for no other purpose." It is Johnson himself

who tells us about his visits to his brother's, his drinking at the market place, his old friend Bobbitt, their visit to the "nip joint," and his trip down the Hillsboro road towards Durham, which was taken after "I decided that I did not want to go home then, so I continued to ride."

The situation is quite simple. This Grocery Company bought a truck to be used in its business, and, when so used, its owner was protected by the policy in judgment. It, with Johnson in charge, had been sent to Raleigh. Johnson, after his business for the company had been concluded, so far as was possible on the night of the 8th of November, then started out on adventures of his own. He began to drink and then called upon a discharged employee of his company. They visited a "nip joint" and remained there until this friend had to go back to work, after which he started home but turned in the wrong direction. This error he soon discovered but made no attempt to correct it; in fact, he tells us that he then had no desire to go back to his brother's but set out on a ride towards Durham for purposes of pleasure, or for some other undisclosed reason, when between five and six miles from the capitol building, at a railway crossing, he ran off the road into a signal box, with results noted.

To ask one to believe that this midnight ride towards Durham was either permissive or commercial is to ask too much.

It is the contention of the railway that this policy or contract consists of agreements and conditions, and that statements attached to it really make up an application for the policy, are not a part of the policy itself, and come under the provisions of section 6289 of the North Carolina Consolidated Statutes, which agreement is written into the policy itself and reads:

"Statements in application not warranties—All statements or descriptions in any application for a policy of insurance, or in the policy itself, shall be deemed representations and not warranties, and a representation, unless material or fraudulent, will not prevent a recovery on the policy."

This policy consists of "Section I—Agreements," "Section II—Conditions," and "Section III—Statements," together with an attached transfer of coverage from one truck to another. Among conditions, we find that "this policy is issued in consideration of the payment of premium and the statements in the schedule of Statements endorsed hereon and hereby made a part hereof, which statements the named assured, by the acceptance of this policy, warrants to be true." If these "statements" be not a part of the policy, it is unintelligible. No assured is named, no truck is described, and no stated sum is underwritten. And yet we find specific reference to these matters in the policy itself.

Time and again in the "Agreements" and "Conditions" reference is made to "Statements," and they must be read together if this contract means anything at all. Indeed the signature of the company, "Conditions" and "Statements" are all printed upon one sheet of paper. Moreover, the provision that this truck can only be used with the permission of the named assured appears in "Agreements," and we must turn, as we have found, to "Statements" to find who the named assured is.

Is the character of the vehicle insured and the purposes to which it is to be put immaterial representations?

These are matters which go to the heart of the contract itself. Plainly one could not insure a truck ostensibly to be used in hauling hay and then load it up with dynamite. And to a less extent it is true that trucks and automobiles are in classes apart. It is a matter of common knowledge that the hazards of occupation differ as does the cost of insuring them against accidents.

To make what was already plain doubly plain, we find the uses of this insured vehicle restated in the "transfer of car endorsement" attached to the policy two months after it was written.

The materiality of these statements, as viewed by the contracting parties, appears in "Conditions," where it is stated that their truthfulness is one of the considerations relied upon.

It is not necessary that we elaborate upon the importance of stating fairly the character and contemplated uses of the vehicle insured.

In *Johnson* v. *New Amsterdam Casualty Co.*, 200 N. C. 763, 158 S. E. 473, 474, a policy contained this provision: " 'This policy does not cover any automobile while being used in any business, trade, or occupation other than that described in Statement 8 of the Schedule.' Statement 8 is as follows: 'The occupation or business of the Assured is wholesale and retail teas, coffees and sugars.' " An accident occurred while one Hirst was driving the car insured, at night, in company with a woman, on business of his own and without knowledge of the assured. Recovery was denied.

If the stipulations under review are in fact incorporated into and are a part of the policy in judgment, then our inquiry as to the governing law of North Carolina is at an end. Its use is to be that as herein stated, which is the business or occupation of the assured—no exceptions. If these "Statements" are not a part of the policy but are only a part of an application therefor, and are material, our inquiry for like reasons is also at an end.

■ Attention is directed to *Howell* v. *American Nat. Ins. Co.*, 189 N. C. 212, 126 S. E. 603, where it is said that their materiality is sometimes a question of law and sometimes a mixed question of law and fact. This finding was reaffirmed in *Harrison* v. *Metropolitan Life Ins. Co.*, 207 N. C. 487, 177 S. E. 423. In this last named case, it was further said that where facts are undisputed and can give rise to but one inference, their materiality is a question for the court. Here the facts are undisputed. Johnson was on pleasure bent, and with no present purpose of turning, on his way to Durham. That this was a commercial use of that truck, no one can seriously contend. We are further told that the question of whether or not there was an abandonment of the master's business is a jury question. *Lazarus* v. *Blue Ridge Grocery Co.*, 201 N. C. 817, 161 S. E. 553. That also is true where the facts are undisputed and can give rise to but one in-

ference. We, ourselves, have had occasion many times to consider this subject, and in *Drake* v. *Laundry Corporation*, 135 Va. 354, 116 S. E. 668, 671, said:

"(1) Where the deviation is slight and not unusual the court may as a matter of law determine that the servant was acting within the scope of his employment; (2) where the deviation is very marked and unusual, the court may determine that the servant was not acting within the scope of his employment; (3) where the facts leave the case between these two extremes, the question should be left to the jury."

We are also told that delivering an automobile by the assured to another with permission to use it for a particular purpose carries with this permission the right of indefinite use. There are cases which so hold. A leading case to that effect is *Stovall* v. *New York Indemnity Co.*, 157 Tenn. 301, 8 S. W. (2d) 473, 72 A. L. R. 1368. An elaborate discussion of this subject will be found in a note to the *Stovall Case* in 72 A. L. R. 1375, *et seq.*

Outside of court one would be surprised to learn that permission to drive to Raleigh carried with it permission to drive to El Paso. In the instant case, Johnson drove to Raleigh, not under general permission but under an express order to proceed to that city, purchase perishable produce, and to return with it promptly to Wake Forest. No liberality of construction can turn these directions into a general permit to use the truck for pleasure purposes.

In *Frederiksen* v. *Employers' Liability Assur. Corp., Ltd., of London, England,* 26 F. (2d) 76, it was held that one who was given an automobile with permission to attend a funeral had no permission to go thereafter on a joy ride.

In *Trotter* v. *Union Indemnity Co.*, 35 F. (2d) 104, the doctrine in the *Stovall Case* was expressly disapproved. As was pointed out in the *Frederiksen Case*, liability does attach where the deviation is slight. In the instant case, we are not dealing with a deviation at all but with an independent venture, unrelated to the assured's business.

It is, of course, true that in the construction of policies of insurance ambiguous provisions should be construed against the insurance carrier, but in their construction, as in the construction of all other contracts, the rule of reason must prevail and the better reasoning lies with these Federal decisions.

This must have been the view of the Supreme Court of North Carolina when it came to consider *Johnson* v. *New Amsterdam Casualty Co., supra.* In that case Hirst was an employee of his corporation, the insurance carrier. Hirst used a company car in going to and from his business and kept it at his home—that is to say, Hirst had the permission of his employer to use its car. Here T. F. Johnson had the right to use this car, not in trips to and from his home but in trips to and from Raleigh, and his business, so far as the car was concerned, was concluded when he had reached his brother's home and had finished his inspection of the city market stalls. It was said of Hirst that "he had finished his work for the day" and was on a venture of his own. It may be said of T. F. Johnson that "he had finished his work for the day" and was on a venture of his own.

Without undertaking to restate policy provisions, our conclusions are these: The policy itself limits the use of the truck; if these limitations be held to be representations only, they are material. The use of the truck upon the occasion in judgment was without permission of the named assured and was not merely a casual deviation from the limitations imposed by the master.

The judgment of the trial court should be reversed and final judgment entered for the defendant. It is so ordered.

*Reversed.*

HUDGINS, J., dissenting.

The contract insured the owner against loss by reason of the ownership or maintenance of the truck. It also insured other persons operating the truck with the permission of

the "named assured." On the date in question the assistant manager of the "named assured" was on a usual trip from Wake Forest to Raleigh to purchase and transport fresh vegetables for resale at the assured's place of business in Wake Forest. The assistant manager was driving the truck and was clothed with discretion as to the time of his departure from either Wake Forest or Raleigh, and the routes of travel. The accident with resulting damage occurred on this trip, and after the assistant manager had missed the way to his brother's home where he was authorized to spend the night.

The statement in the application, which was copied in the policy, was that the assured acquired the truck for the purpose of using it in its mercantile business. The policy contains no express language excluding coverage for any incidental use the owner might make of the truck. The North Carolina statute requires the "statements" to be construed as representations and not warranties. So regarding the "statements," even if the assistant manager made a slight departure from his general instructions, the truck was still being used, in a substantial sense, for the purpose it was acquired.

The majority opinion, in effect, construes the "statement" in the application to be warranties, contrary to the mandates of the statute.