## PRILLAMAN v. CENTURY INDEMNITY CO. OF HARTFORD, CONN.
### Civil Action No. 58.

District Court, W. D. Virginia.

Feb. 12, 1943.

198

Moss A. Plunkett, of Roanoke, Va., and B. A. Davis, of Rocky Mount, Va., for plaintiff.

Showalter, Parson, Kuyk & Staples, of Roanoke, Va., for defendant.

BARKSDALE, District Judge.

This action having been tried upon the facts by the Court without a jury, the Court doth hereby find the facts specially and state separately its conclusions of law thereon, and directs the entry of the appropriate judgment, as follows, in conformity with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c:

### Findings of Fact.

In May, 1941, one W. O. Emerson was in the employment of Palmer Produce Company in the City of Danville, and had title to a partly-paid-for automobile which he occasionally used in transacting the business of his employer.

One William T. Thompson, local agent at Danville for the defendant, Century Indemnity Company, had previously undertaken unsuccessfully to induce Emerson to enter into and pay for a contract of public liability insurance with his company, which Emerson declined to do on account of the cost thereof. However, on May 28, 1941, Thompson pointed out to Palmer Produce Company the possibility of liability upon it which might result from the operation of his car by Emerson while acting as its agent, and it was agreed that a public liability insurance policy, covering the period of one year, should be issued as of that date, insuring Emerson, inter alia, against liability for negligent injury to one person in the operation of his automobile, up to the limit of $10,000, with the understanding that the premium thereon, amounting to $20.51, would be paid not later than July 15, 1941, one-half by Palmer Produce Company and one-half by Emerson. On that date, May 28, 1941, the insurance policy, which is a simple contract, not a sealed instrument, was issued and delivered to Emerson, and the full premium was charged to him by Thompson. On July 15, 1941, Thompson credited defendant, Century Indemnity Company, on his books, with the net premium due it for this insurance policy, after deducting his agent's commission, although no part of the premium had actually been collected by him at that time. On July 18, 1941, it did not suit Emerson to pay any part of the insurance premium, so Thompson collected from Palmer Produce Company $10.25 as one-half of this premium. On September 1, 1941, Thompson returned to the place of business of Palmer Produce Company for the purpose of collecting the remaining one-half of the premium from Emerson, but learned there that Emerson had been found short in his accounts which resulted in his discharge, that he was then employed by one Greenburg, and that Palmer, who had endorsed Emerson's note for the deferred purchase money for the automobile, would probably demand its surrender. Thompson, as agent for Century Indemnity Company, by custom and verbal understanding, had the authority in his discretion, on behalf of the Insurance Company to cancel such policies of insurance. Thompson then went directly to Greenburg's place for the purpose of finding Emerson and procuring a cancellation of the insurance policy. Not finding Emerson on that occasion, Thompson returned the following day, September 2, 1941, and met Emerson. Thereupon, Thompson said to Emerson: "Bill, you know that the Palmer Produce Company was to pay half of this premium, but the whole thing is so long past due, I want to cancel the policy.", to which Emerson replied, "All right", and went on to say that the Palmer Produce Company was helping him buy the car, but since he was no longer there, he could not expect them to help any longer and they would probably turn the car back, and it was all right to cancel the policy. Then Thompson said: "All right, Bill, the policy is cancelled, but I want the policy to send it back to the Insurance Company.", to which Emerson agreed, and told Thompson he might get the policy from the glove compartment of his car parked nearby. Not finding the policy there, Thompson was directed by Emerson to go by his house and his wife would give him the policy, as he then re-

called that he had given it to her that morning with some other papers. Thompson pıomptly proceeded to Emerson's home, and the policy was delivered to him by Emerson's wife. Thompson then took the policy to his office and had it marked "Cancelled" and mailed to the Century Indemnity Company that same day, the policy being received by it September 4, 1941.

The policy contained a provision in regard to cancellation, as follows:

"11. *Cancelation.* This policy may be canceled by the Named Insured by mailing written notice to the Company stating when thereafter such cancelation shall be effective. This policy may be canceled by the Company by mailing written notice to the Named Insured at the address shown in this policy stating when not less than five days thereafter such cancelation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice and the insurance under this policy shall end on the effective date and hour of cancelation stated in the notice. Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing.

"If the Named Insured cancels, earned premiums shall be computed in accordance with the customary short rate table. If the Company cancels, earned premiums shall be computed pro rata. Premium adjustment may be made at the time cancelation is effected and, if not then made, shall be made as soon as practicable after cancelation becomes effective. The Company's check or the check of its representative mailed or delivered as aforesaid shall be a sufficient tender of any refund of premium due the Named Insured."

The procedure outlined in the above provision was not complied with by Thompson, and there is no contention on the part of the defendant that it was.

On his records, Thompson then noted the cancellation as of August 30, 1941, as he had not on September 2nd made his settlement with the company for August, and the cancellation as of August 30th would result in slightly more return premium than a cancellation as of September 2nd.

On Saturday, September 6th, Emerson delivered his automobile to one A. R. Jones, with the understanding that Jones might use the automobile over the week end, and if he liked it, he might purchase it on Monday, September 8th, by paying Emerson for the license tags and assuming the deferred purchase money payments. On Sunday, September 7th, Jones took a party of friends out to ride in this automobile. He began to drink intoxicants, and at her request he permitted one of his guests, Miss Kirkman, to drive the automobile while he and the others rode therein. During this ride, and while the car was being operated by Miss Kirkman, with Jones and his other guests riding therein, plaintiff's decedent, an infant, was struck by the car and fatally injured. A suit for damages resulting from the death of plaintiff's decedent was instituted in the Circuit Court of Henry County against Emerson, Jones and Miss Kirkman. This suit resulted in a judgment in the sum of $10,000, with interest and costs, against Jones and Miss Kirkman, a non-suit having been ordered as to defendant Emerson. This judgment has not been paid, both Jones and Miss Kirkman are insolvent and have no assets which can be subjected to the payment of this judgment or any part thereof, and executions against both of them have been returned marked "No Effects".

Defendant, Century Indemnity Company, received timely notice of the abovementioned fatal accident, and also received timely notice of the institution of the abovementioned action at law in the Circuit Court of Henry County which resulted in the said judgment of $10,000, with interest and costs, although such notices were not given by either said Kirkman or Jones, or anyone on their behalf. The defendant, Century Indemnity Company, promptly denied that there was any coverage under said policy of any liability which might result from said accident upon either said Jones or said Kirkman, and declined to represent them, or either of them, in said action in the Circuit Court of Henry County, and also promptly denied that said insurance policy covered any liability which might result from said accident, against said Emerson, although, by counsel, it did appear for said Emerson in the beforementioned action.

As of August 30, 1941, Palmer Produce Company was indebted to Thompson's insurance agency. Thompson knew that Palmer Produce Company had made the payment on July 18th of $10.25, one-half the premium on the Emerson insurance policy, which was the only payment which

had been made. Therefore, as of August 30, 1941, Thompson credited the sum of $4.96 to the Palmer Produce Company's account, that being the return premium due on the Emerson insurance policy if cancelled as of August 30th. (Later, the cancellation date was changed to September 2nd, that being the date the policy was actually surrendered, which resulted in a deduction of 17 cents from the return premium credit.) On September 12th, a statement of its account, showing the credit for the return premium on the Emerson insurance policy, was delivered to Palmer Produce Company, which refused to accept the credit for the stated reason that it did not wish to become involved in any controversy.

On September 25th, at the direction of counsel for the Century Indemnity Company, Thompson mailed to Emerson a check for the return premium, and this check was endorsed and cashed by Emerson.

No mention of any return premium was made in Thompson's conversation with Emerson on September 2nd, nor did Thompson at that time intend to make any refund of premium to Emerson, it having been his intention to credit such return premium to the account of Palmer Produce Company.

The insurance policy here in question contains the following provision: "Except where specifically stated to the contrary, the unqualified word 'Insured' wherever used includes not only the Named Insured, but also any person while using the automobile and any person or organization legally responsible for the use thereof, provided that the declared and actual use of the automobile is 'pleasure and business', or 'commercial', each as defined herein, and provided further the actual use is with the permission of the Named Insured. * * *"

The declared and actual use of the automobile here in question was for the purpose of "Business and Pleasure".

## Conclusions of Law.

The defendant, Century Indemnity Company, relied ultimately on two defenses, as follows:

(1) That A. R. Jones was not an additional "insured", either under the terms of the policy or under Section 4326a of the Code of Virginia;

(2) That the insurance policy here in question was cancelled by mutual agreement on September 2, 1941, with the result that it was entirely inoperative on September 7, 1941, when the accident occurred.

My conclusions of law, upon these two questions, are as follows:

### Was Jones an Additional Insured?

Undoubtedly, the permission to use the car accorded by Emerson to Jones, was comprehensive and general. It included any use to which Jones might desire to put the car. I am satisfied that if Jones had been personally operating the automobile at the time of the accident, the defendant would concede that he was an additional insured, both under the omnibus clause of the insurance contract and under the provisions of Section 4326a, Code of Virginia. See Maryland Casualty Co. v. Hogue, 153 Va. 204, 149 S.E. 448.

The stated use of the car was for "business and pleasure". Hence, the question of the extent of coverage, which was determinative in the cases of Phœnix Indemnity Co. v. Anderson & Powell, Receivers, etc., 170 Va. 406, 196 S.E. 629, and Ellis v. New Amsterdam Casualty Co., 169 Va. 620, 194 S.E. 687, is not involved here, as the policy clearly covered the type of use to which the car was being put at the time of the accident. Nor is there presented here any question of the effect of a marked deviation from the permissive use which was determinative in the case of Indemnity Insurance Co. v. Jordan, 158 Va. 834, 164 S.E. 539, and which was also considered in Jones v. New York Casualty Co., D.C., 23 F.Supp. 932, by Judge Pollard.

The real basis of defendant's contention on this question is that when Jones permitted Miss Kirkman to operate the automobile, he ceased to be an additional insured either under the omnibus clause of the policy or under Section 4326a, Code of Virginia. The policy here in question has a proviso appended to its omnibus clause as follows: "* * * and provided further the actual use is with the permission of the Named Insured.", and defendant contends that, although in a sense Jones then continued to use the car, such "actual use" was not included in the use permitted by Emerson, the named insured. In other words, the defendant contends that the adjective "actual", as applied to the noun "use", has such a limiting effect as to require the specific permission of the named insured for the precise type of use to which the car was being put at the

time of the accident. Defendant contends that Emerson never contemplated that Miss Kirkman should operate the car, and that his permission to Jones did not include such use. I cannot agree with this contention, because it is my conclusion that the general permission accorded Jones by Emerson was sufficient to include this type of use.

However, the phrase, "actual use", does not appear in Section 4326a, Code of Virginia, the pertinent portion of which is as follows: "No such policy shall be issued or delivered in this State, to the owner of a motor vehicle, by any corporation or other insurer authorized to do business in this State, unless there shall be contained within such policy a provision insuring such owner against liability for damages for death or injuries to person or property resulting from negligence in the operation of such motor vehicle, in the business of such owner or otherwise, by any person *legally using or operating the same with the permission, express or implied, of such owner.*" (Italics mine) It seems clear to me that at the time of the accident Jones was "legally using * * * the same [the automobile] with the permission, express or implied, of such owner", and the provisions of Section 4326a must be considered as "a part of the contract of insurance, irrespective of any inconsistent provisions therein contained." Newton v. Employers Liability Assurance Corp., 4 Cir., 107 F.2d 164, 166; Maxey v. American Casualty Company, 180 Va. 285, 23 S.E.2d 221.

In the case of Jones v. New York Casualty Co., 23 F.Supp. at page 934, the automobile in question had been entrusted by the named insured to one Thomas Piercy, but at the time of the accident he was riding as a passenger and the automobile was being operated by one Henry Windsor without the approval, or even the knowledge, of the named insured. Judgment had been obtained in the State Court against both Piercy and Windsor, so that Piercy and Windsor in that case occupied practically the identical positions of Jones and Miss Kirkman here. Judge Pollard said: "The Court has no difficulty in disposing of defendant's contention that there is no coverage because Henry Windsor was operating the automobile at the time of the accident. A judgment has been obtained against Thomas Piercy, and the question for the Court to determine is whether Thomas Piercy was an additional assured under the terms of the policy. Thomas Piercy, although not driving the automo-

bile at the time of the accident, was using it. He was riding in the car and Henry Windsor was driving it for him. Thomas Piercy was legally responsible for its use. Indeed, the Circuit Court for King George County must have found that at the time of the accident Henry Windsor was the agent of Thomas Piercy, or it would not have rendered a judgment against Thomas Piercy. Under the express language of the policy in suit, if Thomas Piercy was, with the permission of the named assured, 'using' the automobile, or 'legally responsible for its use', he is covered by the policy. The policy does not require that he must have been 'operating' the automobile with the permission of the named assured. The Court finds as a matter of law that Thomas Piercy was at the time of the accident 'using' the automobile in the sense that is contemplated by the terms of the policy."

With this conclusion of Judge Pollard, I am in complete agreement.

From what has been said, it follows that it is my conclusion of law that, if it be assumed that the insurance policy here in controversy was in effect on September 7, 1941, A. R. Jones was an "additional" insured thereunder.

### Was the Insurance Policy Cancelled on September 2, 1941?

█ █ It is quite true that the method of cancellation provided in the policy was not followed, and no one contends that it was. However, it seems clear to me that the method of cancellation provided in the contract of insurance is not exclusive, and even if the policy in terms said it was the only method, I do not believe such a provision would prevent abrogation by mutual agreement. It seems to me beyond question that two parties to a simple contract, who are sui juris, during the term thereof, in the absence of fraud, may, by mutual consent, abrogate the same, if such agreement of abrogation has all the elements of a valid contract, including valuable consideration.

"§ 387.——*Right to Rescind*

"*The parties to an executory contract may abrogate, rescind, or abandon it by mutual agreement independent of any provision in the contract permitting them so to do.*

"The parties to an executory contract may abrogate, rescind, or abandon it by mutual agreement, although it is in writing. The right to terminate a contract by mutual consent exists independent of any provision

in the contract permitting the parties so to do, and the parties may annul the contract, notwithstanding a contrary stipulation. Rescission by agreement implies an existing and unbroken contract. A contract, valid on its face, and actually carried out in full with the acquiescence of all concerned, cannot subsequently be repudiated. The right of rescission is confined to the parties to the contract or to those acting in their right."

17 Corpus Juris Secundum, Contracts, § 387, p. 879.

"The question thus presented is, Where it is stipulated in a contract that changes or modifications must be made in only one way, can the parties by mutual agreement change or modify the contract in any other way?

"The insurance contract introduced in evidence is not under seal. Under common-law principles, the provisions of a simple contract in writing, by subsequent parol agreement of the parties before breach, may be waived, rescinded, added to, changed, or modified. Piedmont Mt. Airy Guano Co. v. Buchanan, 146 Va. 617, 626, 131 S.E. 793; Warren v. Goodrich Strip & Screen Co., 133 Va. 366, 112 S.E. 687; Moore v. Williamson, 213 Ala. 274, 104 So. 645, 42 A.L.R. 981, and note; 13 Corpus Juris, § 609, p. 593; 6 R.C.L. §§ 298, 299, pp. 914, 915; Teal v. Bilby, 123 U.S. 572, 8 S.Ct. 239, 31 L.Ed. 263; Utley v. Donaldson, 94 U.S. 29, 24 L.Ed. 54; Swain v. Seamens, 9 Wall. 254, 19 L.Ed. 554. This rule seems to be generally recognized in both the state and federal courts. The rule is applied notwithstanding the fact that the parties have stipulated in the contract that it can be changed or modified in only one specific way. Williston on Contracts, vol. 3, § 1828, states the rule thus:

" 'A contract in writing, but not required to be so by the Statute of Frauds, may be dissolved or varied by a new oral contract, which may or may not adopt as part of its terms some or all of the provisions of the original written contract. * * * Nor does it make any difference that the original written contract provided that it should not be substantially varied except by writing. This stipulation itself may be rescinded by parole and any oral variation of the writing which may be agreed upon and which is supported by a sufficient consideration is by necessary implication a rescission to that extent.' See 6 R.C.L. §§ 298, 299, pp. 914, 915; Simpson

v. Mann, 71 W.Va. 516, 76 S.E. 895, 48 L. R.A.,N.S., 579; 13 Corpus Juris, § 611, p. 594; Piedmont [Mt. Airy Guano Co.] v. Buchanan, supra.

"In the absence of statutory requirement, there is no reason why the courts should not apply these principles to the construction of insurance contracts, as well as others, and the authorities so hold. See Cyclopedia of Insurance Laws, Couch, § 1385; American Eagle Fire Insurance Co. of New York v. McKinnon, 36 Ariz. 409, 286 P. 183; 32 Corpus Juris, § 257, p. 1147; Wigmore on Evidence, par. 2441.

"While the majority of the courts recognize the fact that these principles apply to insurance contracts, the difficulty in applying them usually arises because the agent with whom the policy holder has dealt is not clothed with authority to bind the company. The notice of motion alleged that the agreement to substitute one car for another in the insurance contract was made with the company, and hence there was no error in overruling the demurrer."

Zurich General Accident & Liability Ins. Co. v. Baum, 159 Va. 404, 408, 165 S.E. 518, 519.

See also Hi-Grade Oil & Gas Co. v. United States Fidelity & Guaranty Co., 93 W.Va. 448, 117 S.E. 157; Addia v. Globe & Rutgers Fire Ins. Co., 97 W.Va. 443, 125 S.E. 161.

Upon the evidence in this case, there seems to be no doubt that on September 2, 1941, Thompson and Emerson agreed upon the cancellation of the contract of insurance and that all rights and liabilities of both parties to the contract, i. e., the Insurance Company and Emerson, should forthwith be terminated. I have no difficulty in reaching the conclusion that there was a true aggregatio mensium. Thompson and Emerson reached a complete and voluntary agreement. The evidence is uncontradicted that Thompson had the authority, as agent for defendant, to cancel. In my opinion, if Thompson had then and there refunded the return premium due, or had promised so to do, there would be no question whatever about the existence of valuable, complete and adequate consideration. Thompson at that time neither refunded the return premium to Emerson, nor intended so to do. He knew that Palmer Produce Company had made the only payment on account of premium which had been made. He therefore assumed that a return premium should go

to Palmer Produce Company. Possibly, the fact that Palmer Produce Company owed him money, to some extent induced this conclusion. I think that the return premium was legally due, under the circumstances, to Emerson, and apparently the Insurance Company thought so too, as the refund was finally made to Emerson. However, I am satisfied that Thompson's thought and action in crediting the return premium to Palmer Produce Company were based upon sufficiently good reasons to relieve him of any implication of fraud.

But it seems to me the valuable consideration obtained by Emerson in this transaction, and which makes valid the abrogation agreement, was the release of Emerson from any further liability for the unpaid balance of one-half of the insurance premium for which Emerson was then liable.

On September 2nd, Emerson was personally liable to the Insurance Company through Thompson, its agent, for $10,26, which liability terminated upon his surrender of the policy and the cancellation thereof. It is true that Thompson had credited the full yearly premium on this policy to the Insurance Company on his books, but the evidence is uncontradicted that this was only a conditional credit, and that if the money were not actually collected by Thompson, the Company would take the loss and not Thompson, it being provided in the agency contract that the agent is only liable for premiums if collected.

It seems to me that on September 2, 1941, the actual contractual relationship existing between Emerson and the Insurance Company was that both of them were parties to a contract partly performed and partly executory as to each contracting party. At the inception, Emerson and his employer, on his part had promised to pay the premium; the Insurance Company on its part had promised to insure him against certain contingent liability. By September 2nd, Emerson had partly performed his contract (or it had been performed for him) by paying one-half of the premium; the Insurance Company had partly performed its contract by insuring Emerson for something over three months. Emerson, on his part, was still obligated to pay to the Insurance Company the remaining one-half of the premium, which was then past due; the Insurance Company, on its part, was still obligated to insure Emerson for the balance of the year. It seems to me clear that the relinquishment by each party to the contract of the remaining obligation of the other, constituted valuable consideration on both sides.

It is true that in the conversation between Emerson and Thompson on September 2nd, Thompson did not use any precisely specific language in regard to the release of Emerson from his obligation for the remaining one-half of the premium, such as, "You, Emerson, in consideration of this cancellation, are discharged from further liability to pay the remaining one-half of the premium." However, I am satisfied from the evidence as to this conversation that it was perfectly well understood by both Thompson and Emerson that he was to be released from any further payment of premium upon the cancellation of the policy, and that it was his desire to be relieved of such obligation that prompted Emerson to so readily agree to the cancellation of the policy.

Therefore, it is my conclusion that the contract of insurance between defendant, Century Indemnity Company, and Emerson, theretofore in force, was cancelled on September 2, 1941, by valid mutual agreement of the parties thereto, and all rights and obligations of both parties thereto then and there terminated.

It follows that an order will be entered dismissing this action, at the costs of the plaintiff.